1

**BRYAN CAVE LLP**
Katherine M. Windler, California Bar No. 158899

2

120 Broadway, Suite 300
Santa Monica, California 90401-2386

3

Telephone:     (310) 576-2100
Facsimile:     (310) 576-2200

4

Email:         katherine.windler@bryancave.com

5

Attorneys for Madison Realty Capital LP

6

7

8

**UNITED STATES BANKRUPTCY COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

**LOS ANGELES DIVISION**

11

| In re | Case No. 2:10-bk-26188-PC (Lead Case) |

12

Administratively Consolidated with Case No. 2:10-bk-27683-PC

13

NEVADA STAR, LLC,

14

Hon. Peter Carroll

15

Debtor.

Chapter 11

16

Tax ID / EIN: 68-0658426

**SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION**

17

18

19

In re

**Hearing on Second Amended Disclosure Statement**

20

CLAUDIA RAFFONE,

21

Date:     April 6, 2011
Time:     9:30 a.m.
Ctrm:     1539

Debtor.

22

U.S. Bankruptcy Court
255 E. Temple Street, 15th Floor
Los Angeles, CA 90012

23

24

**Plan Confirmation Hearing**

25

Not Yet Set

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................... 1

    A.    Purpose of This Document. ........................................................................ 3

    B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing. ............ 4

        1.    Time and Place of the Confirmation Hearing. ............................... 4

        2.    Deadline For Voting For or Against the Plan. .............................. 4

        3.    Deadline For Objecting to the Confirmation of the Plan. ......................... 4

        4.    Identity of Person to Contact for More Information Regarding the
Plan. .............................................................................................. 4

    C.    Disclaimer. ................................................................................................ 5

II.    BACKGROUND .................................................................................................... 5

    A.    Description and History of the Debtor's Business. ................................... 5

        1.    History According to Raffone ....................................................... 6

        2.    History According to Campbell ................................................... 12

    B.    Principals/Affiliates of Debtor's Business. .............................................. 15

    C.    Management of the Debtor Before and After the Bankruptcy. ................. 15

    D.    Events Leading to Chapter 11 Filing ....................................................... 17

    E.    Significant Events During the Bankruptcy ............................................... 26

        1.    Bankruptcy Proceedings. ........................................................... 26

            a.    Bankruptcy Case Matters: ............................................. 26

            b.    Other Legal Proceedings. .............................................. 27

        2.    Actual and Projected Recovery of Preferential or Fraudulent
Transfers. ................................................................................... 27

        3.    Procedures Implemented to Resolve Financial Problems. ....................... 28

        4.    Current and Historical Financial Conditions. ............................ 29

III.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS IN
THE DEBTOR'S ESTATES ................................................................................ 29

    A.    General Overview ..................................................................................... 29

    B.    Unclassified Claims ................................................................................. 30

        1.    Administrative Expenses ............................................................ 30

        2.    Court Approval of Fees Required. .............................................. 31

        3.    Priority Tax Claims. ................................................................... 32

    C.    Classified Claims and Interests. .............................................................. 32

        1.    Classes of Secured Claims. ........................................................ 32

        2.    Classes of Priority Unsecured Claims. ...................................... 44

        3.    Class of General Unsecured Claims. .......................................... 47

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

| | 4. | Class of Subordinated Claims | 48 |
| | 5. | Class of Interest Holders. | 48 |
| D. | | Quarterly Fees | 48 |
| E. | | Mutual General Releases | 49 |
| F. | | Means of Effectuating the Plan. | 50 |
| | 1. | Debtor's Alternative | 50 |
| | 2. | Funding for the Plan. | 50 |
| | 3. | Requirement of Tax Election | 50 |
| | 4. | Post Confirmation Authority of Administrator | 51 |
| | | a. Sale of Property | 51 |
| | | b. Overbid Procedures and Break Up Fee | 52 |
| | | c. Sale Order | 55 |
| | | d. Closing | 55 |
| | | e. Auction and Other Conditions | 56 |
| | 5. | Payment of Creditors | 60 |
| | 6. | Use of Cash Collateral | 60 |
| | 7. | Post-Confirmation Management. | 61 |
| | 8. | Disbursing Agent. | 61 |
| | 9. | Entry of the Confirmation Order | 61 |
| | 10. | Entry of Final Decree | 61 |
| G. | | Risk Factors. | 61 |
| IV. | Other Provisions of the Plan. | | 61 |
| A. | | Executory Contracts and Unexpired Leases | 61 |
| | 1. | Assumptions. | 61 |
| | 2. | Rejections. | 62 |
| B. | | Changes in Rates Subject to Regulatory Commission Approval. | 62 |
| C. | | Dismissal of Litigation. | 62 |
| D. | | Retention of Jurisdiction. | 63 |
| E. | | Tax Consequences of Plan. | 63 |
| V. | CONFIRMATION REQUIREMENTS AND PROCEDURES | | 64 |
| A. | | Discharge | 64 |
| B. | | Revesting of Property in the Debtor | 64 |
| C. | | Modification of Plan. | 65 |
| D. | | Post-Confirmation Status Report | 65 |
| E. | | Quarterly Fees | 65 |
| F. | | Post-Confirmation Conversion/Dismissal | 66 |

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

G.     Revocation of Plan Confirmation Order ................................................ 66

H.     Who May Vote or Object. ............................................................... 66

     1.     Who May Object to Confirmation of the Plan. ............................ 66

     2.     Who May Vote to Accept/Reject the Plan. ................................. 66

         a.     What Is an Allowed Claim/Interest. ............................... 66

         b.     What Is an Impaired Claim/Interest. .............................. 67

     3.     Who is Not Entitled to Vote. ....................................................... 68

     4.     Who Can Vote in More Than One Class. ..................................... 68

     5.     Votes Necessary to Confirm the Plan. ........................................ 68

     6.     Votes Necessary for a Class to Accept the Plan. ......................... 68

     7.     Treatment of Nonaccepting Classes. ........................................... 69

     8.     Request for Confirmation Despite Nonacceptance by Impaired Class(es). ..................................................................................... 69

I.     Liquidation Analysis. ..................................................................... 69

     1.     Benefits of Chapter 11 Plan ........................................................ 71

J.     Feasibility. ..................................................................................... 72

K.     Final Decree. ................................................................................. 73

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

# I.  **<u>INTRODUCTION</u>**

Nevada Star, LLC ("Nevada Star" or "Debtor") is the Debtor in a Chapter 11 bankruptcy case known as 2:10-bk-26188-PC.  On April 26, 2010, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code ("Bankruptcy Code"), 11 U.S.C. § 101 *et seq*.  The Debtor's principal asset is a parcel of real property, commonly described as a 49 unit apartment building,[1] located at 114 West 86th Street in New York City, N.Y. and all fixtures and incidental personal property that is used for the operations and maintenance of the building (the "Property").

Claudia Raffone ("Raffone") is also a debtor in the administratively consolidated Chapter 11 bankruptcy case known as 2:10-bk-27683-PC.  On May 4, 2010, Raffone filed a voluntary petition under chapter 11 of the Bankruptcy Code.  Raffone's principal assets are two single family residences located in Beverly Hills, California and Florida, although she may have additional assets available for liquidation as well.  On October 14, 2010, the Court ordered the cases of the Debtor and Raffone to be administratively consolidated [Debtor Dkt No. 146; Raffone Dkt No. 29].

**<u>This disclosure statement does not apply to the Raffone bankruptcy estate</u>**.  While the disclosure statement reveals facts and events that occurred affecting the Raffone estate, such disclosures are made in order to assist creditors in understanding their rights and how the proposed plan in the Debtor's case may impact any rights they may also have in the Raffone estate.

Chapter 11 allows the Debtor and Raffone, and under some circumstances, creditors and others parties in interest, to propose a plan of reorganization.  The plan filed along with this Second Amended Disclosure Statement ("Disclosure Statement") is a Chapter 11 Plan of Liquidation ("Plan") for the Debtor only.  A plan may provide for the debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.  This Plan intends to cause the sale of the Debtor's Property.

---

[1]    When the superintendant's 2-bedroom apartment in the basement is included, the building is considered to have 50 units.  However, only 49 units are available for lease to the public.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1    Prior to the closing of the sale of any asset, the Plan provides for the property of the

2  Debtor's estate to be operated by an administrator appointed under the Plan. Madison Realty

3  Capital, L.P. ("Madison" or the "Proponent") is the party proposing the Plan sent to you in the

4  same envelope as this document. The creditors who have indicated their support for the Plan are:

5  (i) the Internal Revenue Service, (ii) the Committee of Creditors Holding Unsecured Claims

6  ("Committee"), (iii) Henry Douglas Campbell ("Campbell"), and (iv) Fox Rothschild, the largest

7  creditor in the general unsecured creditor class. Numerous other creditors are believed to be

8  favorable toward the Plan but may not favor every component of the Plan. Raffone has indicated

9  she is opposed to the confirmation of the Plan, despite that her interests in the Debtor remain

10  unaltered. Certain law firms holding lien claims have indicated their preference for a plan that

11  would not include a drop dead closing date of June 30, 2011. It is impossible for the Proponent to

12  predict whether this Plan might be confirmed. THE DOCUMENT YOU ARE READING IS THE

13  DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

14    This is a liquidating Plan. In other words, the Proponent seeks to accomplish payments

15  under the Plan by appointing an independent post confirmation administrator ("Administrator") to

16  sell the Property of the Debtor's estate to pay the Debtor's creditors. The assets of the Raffone

17  estate will not be sold under this Plan to satisfy creditor claims against Raffone.[2] A list of the

18  known assets of Nevada Star is attached at <u>Exhibit A</u>. The Plan Administrator may locate

19  additional assets which are intended to be included in this Plan, even if not discovered until a later

20  date.

21    To the extent that any unsecured claim is successfully asserted against the Debtor, it will

22  be paid from the funds obtained from the liquidation of assets *only after* certain other secured

23  claims, administrative claims and priority claims of creditors of Nevada Star are satisfied as

24  provided for in this Plan (*see* Section II.C.3.a. below). A list of the filed and scheduled claims

25  (non-disputed) against Nevada Star is attached at <u>Exhibit B</u>.

---

26  [2]    There is overlap between the creditors of the two bankruptcy estates, in that certain claims are

27  asserted against both estates. Nothing in this Plan prohibits any unpaid portion of an allowed claim against the Debtor under this Plan from being asserted against Raffone. In addition, under the Plan, the Internal

28  Revenue Service ("IRS") has agreed to accept a substantial discount as a settlement of its litigation claims.

1    The effective date of the proposed Plan is the first date that is 14 days after the entry of an

2    order confirming the Plan, providing no stay pending appeal is obtained by that date (the

3    "Effective Date").

4    **A.    Purpose of This Document.**

5    This Disclosure Statement summarizes what is in the Plan, and tells you certain

6    information relating to the Plan and the process the Court follows in determining whether or not to

7    confirm the Plan.  The Plan seeks to resolve all claims against Nevada Star.

8    **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

9    **KNOW ABOUT:**

10    **(1)    WHO CAN VOTE OR OBJECT,**

11    **(2)    WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will**

12    **likely receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO**

13    **WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,**

14    **(3)    THE HISTORY OF THE DEBTOR AND RAFFONE AND SIGNIFICANT**

15    **EVENTS DURING THE BANKRUPTCY CASES,**

16    **(4)    WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER**

17    **OR NOT TO CONFIRM THE PLAN,**

18    **(5)    WHAT IS THE EFFECT OF CONFIRMATION, AND**

19    **(6)    WHETHER THIS PLAN IS FEASIBLE.**

20    This Disclosure Statement cannot tell you everything about your rights.  You should

21    consider consulting your own lawyer to obtain more specific advice on how this Plan will affect

22    you and what is the best course of action for you.

23    Be sure to read the Plan as well as the Disclosure Statement.  If there are any

24    inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

25    The Bankruptcy Code requires a Disclosure Statement to contain "adequate information"

26    concerning the Plan.  The Bankruptcy Court ("Court") has approved this document as an adequate

27    Disclosure Statement, containing enough information to enable parties affected by the Plan to

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  make an informed judgment about the Plan. Any party can now solicit votes for or against the

2  Plan.

3  **B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing.**

4          THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS

5  DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT

6  YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE

7  PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS AND ON ALL

8  CREDITORS AND INTEREST HOLDERS IN THESE CASES.

9          **1.    Time and Place of the Confirmation Hearing.**

10          The hearing where the Court will determine whether or not to confirm the Plan will take

11  place on the date set forth in the accompanying notice, once set, in Courtroom 1539, 15th Floor,

12  United State Bankruptcy Court, 255 E. Temple Street, Los Angeles, California 90012.

13          **2.    Deadline For Voting For or Against the Plan.**

14          If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot

15  and return the ballot in the enclosed envelope to Katherine M. Windler, Attorney at Law, c/o

16  Bryan Cave LLP, 120 Broadway, Third Floor, Santa Monica, California, 90401.

17          Your ballot must be received by the date set forth in the accompanying notice or it will not

18  be counted.

19          **3.    Deadline For Objecting to the Confirmation of the Plan.**

20          Objections to the confirmation of the Plan must be filed with the Court and served upon

21  Katherine M. Windler, Attorney at Law, c/o Bryan Cave LLP, 120 Broadway, Third Floor, Santa

22  Monica, California, 90401 by the date set forth in the accompanying notice.

23          **4.    Identity of Person to Contact for More Information Regarding the**

24              **Plan.**

25          Any interested party desiring further information about the Plan should contact Katherine

26  M. Windler, Attorney at Law, c/o Bryan Cave LLP, 120 Broadway, Third Floor, Santa Monica,

27  California, 90401, telephone 310-576-2105, facsimile 310-260-4105, email

28  katherine.windler@bryancave.com.

SM01DOCS\829745.2

4

**C.      Disclaimer.**

The financial data relied upon in formulating the Plan is based on Debtor's books and records, information received from Raffone and Campbell and court pleadings filed by them in various litigation matters that occurred before the bankruptcy cases, and information learned about the Property from the operations managed by Minuit Partners Property Management LLC ("Minuit") during the time of the chapter 11 cases.  The information contained in this Disclosure Statement was written by the attorney working at the law firm hired by the Proponent based on documents and information that was provided to it by the Debtor, Raffone, Campbell and Minuit. A substantial portion of the records of the Debtor and Raffone were not made available to the Proponent.  The Plan Proponent represents that everything stated in the Disclosure Statement is true to the Proponent's best knowledge.  The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

**II.      BACKGROUND**

**A.      Description and History of the Debtor's Business.**

The Debtor is a New York limited liability company.  The Debtor filed its chapter 11 case on April 26, 2010.  Since the inception of the case, the Debtor has not been permitted to manage and operate its business as a debtor in possession.  Instead, Minuit was appointed to act as the property manager for the Property by the Honorable Judge Peter O. Sherwood of the New York Supreme Court by order entered on March 25, 2010 in the New York Sale Litigation (defined below).  Minuit managed the Property, collected rents, paid expenses and repairs and prepared all the Monthly Operating Reports through January 2011.  Copies of the Monthly Operating Reports ("MORs") are available from Pacer at https://pacer.login.uscourts.gov/cgi-bin/login.pl or by writing to the plan proponent at the address in the top left corner of the first page of this document, who will provide copies of the MORs to any requesting party.

Raffone is an individual who resides in Beverly Hills, California, and who maintains a residence in Florida.  Raffone has been involved in significant litigation with Campbell for many years.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

1    Because Raffone and Campbell have totally different perspectives on how this bankruptcy

2    case came about, and what facts are relevant in helping creditors understand how they find

3    themselves in this position today, each individual's perspective is represented below, first the

4    factual history according to what Raffone has told the Plan Proponent, and then the factual history

5    according to what Campbell has told the Plan Proponent.  Plan Proponent does not promote the

6    truth or accuracy of either individual's perspective.

7    ### 1.    <u>History According to Raffone</u>

8    Traute Raffone ("Traute") was born in Czechoslovakia on August 20, 1920. She married

9    John Joseph Raffone and had a daughter named Claudia Raffone.  Claudia Raffone is the person

10   referred to in this Disclosure Statement as "Raffone."  Following a divorce, Traute married

11   Campbell on August 27, 1966.  Traute continued to use her first husband's last name even after

12   her marriage to Campbell.  On March 31, 1980, Traute's aunt, Olga Elfer, individually and as the

13   executrix of the estate of Alexander A. Elfer, deceased, transferred title of the Property to Traute.

14   John P. Reiner, Esquire ("Reiner") assisted with the title transfer and notarized the papers.  In or

15   around 1982, Olga Elfer died and left the Property to Traute. For many years, Traute lived in the

16   Property. At various times, Campbell lived in units in the Property, and later lived in the Property

17   with Traute.

18   During the late 1960's through the 1990's, Traute executed a series of wills and codicils

19   that consistently left the bulk of her estate to Raffone and some bequests to Campbell.  The

20   amount of the bequests to Campbell appeared to vary based on Traute's understanding of real

21   estate holdings that Campbell owned in Jamaica.  The majority of the wills and codicils were

22   prepared by Traute's longtime attorney Reiner.

23   On August 18, 1985, Campbell executed a waiver of right to take an elective share of

24   Traute's estate.  Raffone attended boarding school and college in the 1970's – 1980's and, in

25   January 1990, moved into the penthouse apartment in the Property.  After Raffone moved to New

26   York, the relationship between Raffone and Campbell became strained as each weighed in with

27   their opinions as to how Traute could more efficiently manage the Property.  Raffone suspected

28   that Campbell, along with the building's management company, Brown Harris Stevens, was

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

1   deliberately helping tenants with rent controlled apartment units, who were not using their units as

2   a primary residence (as required by law), to evade detection.  She also believed the management

3   company and Campbell frequently duped Traute into permitting non- primary residents to renew

4   their leases when Traute had the right to forgo renewal and rent the apartments to other tenants at

5   full market value.  Campbell in turn contended that Raffone was "meddling" in her mother's

6   affairs.

7        During the 1990's, Raffone and Traute purchased a beach house in Rehoboth Beach,

8   Delaware and spent summers together there. Campbell did not come to Rehoboth Beach but

9   instead stayed in New York.  On October 13, 1994, Campbell signed a second waiver of his right

10  to take an elective share of Traute's estate.  On March 5, 1995, Traute wrote to her lawyer Reiner

11  about changing her will (concerning a specific bequest of no material significance here) and

12  enclosed a copy of Campbell's waiver of his right to take an elective share.  On May 31, 2000,

13  Traute and Raffone jointly purchased an apartment unit at 214 Chilean Avenue, Palm Beach,

14  Florida.  Shortly thereafter Raffone moved into the apartment on Chilean Avenue.  Between 2000-

15  2001, Traute incurred significant consumer debts and Campbell blamed the debts on Raffone.

16       In 2002, Traute took out a 30-year mortgage on the Property and used some portion of the

17  funds to pay for renovations to the Property and also to satisfy various accumulated debts and

18  judgments owed by her and Raffone.

19       During 2002-2003, Campbell had Traute sign several powers-of attorney that purported to

20  transfer various rights to him and an accountant named Leonard Fay, C.P.A.  The powers of

21  attorney were handwritten by Campbell and Traute's signature appears shaky.  In 2003, Campbell

22  grew exceedingly angry at what he perceived to be excessive spending by Traute on her daughter

23  Raffone.  He began writing numerous angry handwritten memos to Traute, various personnel at

24  the management company for the Property, the accountant Leonard Fay, and personnel at various

25  banks, claiming that, for example:  "The only thing she looks forward to is sending large sums of

26  money to her daughter in Palm Beach either daily or every other day."  Campbell is a prolific

27  writer and his handwritten memos were typically several pages long, and full of terse, apocalyptic

28  and vengeful language directed at Traute and Raffone.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1    On April 11, 2003, Traute went to her lawyer's office, Reiner, and executed what became

2    known as "the April Will." This will (consistent with prior wills) left the majority of her assets to

3    Raffone. The April Will also named Raffone as executor and gave her discretion as to certain

4    bequests to Campbell. On April 14, 2003, only three days after Traute signed the April Will,

5    Campbell drafted, signed, and had the local dry cleaner notarize, a handwritten revocation of "all

6    previous wavers [sic]". Although he denied it at his deposition, it seems clear that Campbell

7    found the April Will shortly after it was signed by Traute, realized that it provided very little for

8    him and also gave discretion to Raffone. He therefore decided to "revoke" the waivers of right to

9    elective share to ensure that he received 1/3 of Traute's assets (which at the time included the

10   Property now held by the Debtor).

11   On August 26, 2003, Reiner sent a letter to Traute, referencing a recent meeting where she

12   had discussed gifting the Property to Raffone, and warning her of potential tax consequences. On

13   September 9, 2003, Traute (as her Aunt Olga Elfer did many years earlier) gifted the Property to

14   Raffone via Warranty Deed while visiting her daughter in Florida. On October 16, 2003,

15   Campbell prevailed upon Traute to sign a "Last Durable Power of Attorney" in favor of Campbell.

16   The document was witnessed by two doormen who worked in the Property, and was signed by a

17   notary at the Emigrant bank around the corner from the Property. On November 6, 2003, Reiner

18   filed the Warranty Deed, transferring title of the Property from Traute to Raffone, in New York.

19   On November 14, 2003, Campbell apparently learned of the registration of the Warranty

20   Deed and forged what later became known as "the November Will." The November Will

21   purported to disinherit Raffone, left the bulk of Traute's estate to Campbell and provided for a

22   smaller bequest to Raffone's cousin, Michael Wacher, in Germany. The November Will was

23   purportedly witnessed by another doorman at the Property, and a nearby resident, and signed and

24   notarized by an employee at Emigrant Bank. During his deposition the doorman later stated

25   emphatically that he did not read English, had no idea what he was signing, and recalled that the

26   testator Traute, who he knew very well, was not present when he signed the document.

27   On the day after the November Will was purportedly executed, Traute was admitted to

28   Mount Sinai Hospital in New York for vomiting. Raffone contends that Traute was poisoned by

Campbell, who has admitted to being responsible for ensuring she took her many medications.  In November 2003, Campbell surreptitiously taped many conversations between Raffone and Traute.  In some of the tapes, Raffone appears to be heard using racial epithets to describe Campbell.

On November 20, 2003, Dr. Gottlieb, a physician in New York, wrote a letter indicating that Traute may be suffering from Parkinson's Disease.  In late November 2003, after another hospitalization, Traute moved to Florida to live with Raffone and Claudia's husband Donald St. John.  Campbell frequently called the Palm Beach Police Department and the State of Florida, Department of Children and Family Services Adult Protective Services, claiming that Traute had been kidnapped and was being held against her will.  As evidenced by numerous reports, both the Palm Beach Police Department and the State of Florida, Department of Children and Family Services Adult Protective Services, thoroughly investigated these charges (including isolated interviews with Traute) and found them to be groundless.

On July 30, 2004, Campbell filed a verified complaint against Raffone seeking injunctive relief and to rescind the transfer of the Property, in New York Index No. 60246/04 (the "Fraudulent Transfer Litigation").  In the Fraudulent Transfer Litigation, Campbell alleged that at the time of the transfer Raffone "took advantage of the infirm state" of Traute.  During his prosecution of the Fraudulent Transfer Litigation in the New York court, Campbell repeatedly tried to admit portions of the audiotapes of conversations between Raffone and Traute into evidence and submitted handwritten transcripts of those portions containing alleged racial epithets, to the court.

In September 2004, after Raffone had the basement of the Property cleaned, Campbell filled out a police report claiming that many of his "antiques" had been stolen.  As a result, during a routine visit to New York, Raffone was arrested.  On October 18, 2004, Traute filed a one page handwritten affidavit in which she explained that she had moved to Florida to escape Campbell and that she living there of her own free will.  She also stated in the affidavit that it had always been her intent to gift the Property to her daughter.  On October 22, 2004, the New York Supreme Court issued a decision and order denying Campbell's request for injunctive relief.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1    On October 29, 2004, Campbell amended the Fraudulent Transfer Litigation to add a claim

2    that Traute was incapacitated and incompetent to make the gift of the Property to Raffone.  The

3    Fraudulent Transfer Litigation continued for 3½ years, and was ultimately stayed by the death of

4    Traute in December 2007.

5    On May 17, 2007, Richard Hershman, Esq. ("Hershman") counsel for Campbell, filed an

6    Affidavit to Vacate Default that attached the November Will as an exhibit.  This was the first time

7    the alleged November Will was disclosed.  In his Affidavit, Hershman states at paragraph 10:

8          Plaintiff now supplements his showing to the Court of his
           interest in the subject premise by the Last Will & Testament
9          executed by Traute on November 14, 2003, believed to have
           been prepared at the law offices of Mujica & Goodman, 103
10         West 86th Street, New York, New York and executed at the
           Emigrant Savings Bank, before Mary Frances Gattuso the
11         assistant treasurer of the bank.  *See* Exhibit E.  The Court
           should be advised that plaintiff Douglas Campbell was not
12         involved in any aspect in the preparation or execution of this
           will.
13

14    In 2007, one of the rent control tenants in the Property (who appeared to be a non-primary

15    tenant as evidenced by the fact that his answering machine in the apartment unit answered in the

16    name of a business with several extension lines), named John Schreiber, began paying Campbell's

17    rent on the Property.  Raffone contends that John Schreiber agreed to pay Campbell's rent in

18    exchange for a portion of any settlement obtained by Campbell in his lawsuits against Raffone.

19    On September 14, 2007, Raffone registered the Debtor with the New York Secretary of

20    State, and subsequently transferred ownership of the Property to the Debtor.

21    On December 13, 2007, Traute died at Palms West Hospital, Loxahatchee, Florida.  On

22    January 22, 2008, Raffone filed a Petition for Administration of the April Will of the Estate of

23    Traute in Palm Beach County, Florida, Case No. 502008-CP-000346-XXXXXMB (the "Probate

24    Litigation") and she was appointed as the personal representative of the estate.  On April 25, 2008

25    Campbell filed a Counter-Petition of the November Will.  On April 30, 2008, the Florida court

26    entered a order vacating the appointment of Raffone as personal representative of the Estate of

27    Traute, due to the later November Will, which had not been disclosed in the Petition for

28    Administration filed by Raffone.  On May 7, 2008, Campbell filed a Statement of Claim in the

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

1    estate stating that he had incurred $5,000,000.00 in legal fees.  On May 7, 2008, Campbell filed a

2    Statement of Claim in the estate alleging that he had incurred $43,000.00 in payments of the

3    mortgage and maintenance fees related to the Property.  On May 7, 2008, Campbell filed a

4    Statement of Claim in the estate alleging that he had an interest in ½ of the Property.  On August

5    18, 2008, Campbell filed a Surcharge Petition seeking recovery of the value of the Property

6    ($17,000,000.00 claimed by Campbell) plus $43,000.00 in payments of the mortgage and

7    maintenance fees related to the Property.

8        On June 13, 2008, Campbell filed a separate civil complaint Florida state court, known as

9    Case No. 502008-CA-17861-XXXXMB AG seeking to recover $43,000.00 in payments of the

10    mortgage and maintenance fees related to the Property (the "Florida Civil Litigation").  It is

11    unclear why Campbell commenced the Florida Civil Litigation as the Probate Litigation was fully

12    underway at that time.

13        Litigation in the Probate Litigation continued from early 2008 until the bankruptcy cases

14    were commenced.  Litigation in the Florida Civil Litigation continued until the time of the

15    settlement in the Probate Litigation in 2009.  That settlement has never been implemented.

16        Ultimately, Campbell believed that the Probate Litigation was resolved by a written

17    settlement, which would have paid Campbell $2.5 million plus attorneys' fees.  However, while

18    Raffone did sign the settlement agreement, she declined to sign any of the collateral documents,

19    angering Judge Cook in the Probate Litigation, who then entered an order holding Raffone in

20    contempt, threatening to jail her, and transferring ownership of the Property to Campbell.

21        On April 14, 2010, Raffone's New York counsel, Beys, Stein & Mobargha LLP ("Beys

22    Stein"), attended a civil contempt hearing in the Probate Litigation.  At that hearing, Judge Cook,

23    the judge in the Probate Litigation, made a statement to the effect that "there's enough value in the

24    Property to pay everyone, including Campbell and his claim for attorneys fees."  Given its tone

25    and context, Raffone believes that Judge Cook would rule that Raffone is entitled to any surplus

26    equity in the Property.  At the subsequent hearing on April 20, 2010, in New York in the New

27    York Sale Litigation (defined below), Beys Stein argued that the meaning of Judge Cook's

28    statement was that Raffone was the true owner of the Property and Campbell was merely a

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  creditor holding a claim for the payment of money.  Raffone believes that Campbell's attorney

2  Hershman conceded that point and that Campbell should cease making claims to be the sole

3  managing member of the Debtor.

4  **2.    History According to Campbell**

5  Traute married Campbell on August 27, 1966.[3]  They remained married until Traute's

6  death on December 13, 2007.  During their marriage, and on repeated occasions before

7  September 9, 2003, Traute promised to transfer a 50% interest in the Property to Campbell.

8  On April 11, 2003, under the coercive, abusive and oppressive influence of Raffone, which

9  acts eliminated any of Traute's free will, Raffone caused Traute to execute the April Will whereby

10  Traute appointed Raffone as her sole heir and willed only $300 to Campbell.

11  On September 9, 2003, under the coercive, abusive and oppressive influence of Raffone,

12  Raffone caused Traute to gift the Property to Raffone by recorded deed for no consideration.

13  Raffone did not advise Campbell of this transfer and failed to report it to any taxing agency until

14  October 2008, on which form she testified that the value of the Property at the time of the

15  September 9, 2003 transfer was $5,000,000.

16  In 2008, Raffone obtained an appraisal of the Property at $25 million to secure an

17  $8 million loan from the Plan Proponent.  Raffone had previously caused Traute to obtain a prior

18  secured loan for $422,000, much or all of which net proceeds were paid to or used for the benefit

19  of Raffone.  In October 2008, Raffone sent a letter to the IRS requesting it to abate the tax

20  penalties on the unreported transaction.  Raffone asserted that Traute was incompetent to handle

21  her financial affairs dating back to September 2003.  This statement to the IRS is an admission

22  that the transfer of the Property to Raffone in September 2003 was a fraudulent transfer under

23  applicable law.  Raffone was fully aware of Traute's promise to give 50% interest in the Property

24  to Campbell.

25

26  [3]    Indicative of how adversarial the relationship between Raffone and Campbell has become, they
cannot even agree on the date of Campbell's marriage to Traute.

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1    Campbell learned of the April Will on November 11, 2003.  Three days later, Traute

2    requested that Campbell assist her in executing the November Will, by which Traute appointed

3    Campbell as the executor, and provided to pay Raffone zero, some small portion of her estate to

4    other relatives, and the majority of the estate to Campbell.  The November Will revoked all prior

5    wills.

6    When Raffone learned that Traute was contemplating transferring all her assets to a trust

7    and having a guardian appointed, and on or about November 23, 2003, Raffone and her then-

8    husband kidnapped Traute from her New York residence at the Property, in her house dress and

9    slippers and without her medications, and drove her to Florida.  Raffone cut off all contact

10   between Campbell and Traute.  Campbell never saw Traute alive again.  When Traute died,

11   Raffone refused to tell Campbell of her death and did not advise Campbell of the Probate

12   Litigation until 77 days after the death of Traute.

13   Approximately 6 months after Traute was forcibly moved to Florida against her will, and

14   in July 2004, Campbell commenced the Fraudulent Transfer Litigation.

15   In January 2008, while the Fraudulent Transfer Litigation was stayed, Raffone filed the

16   Probate Litigation.  In that Florida action, Raffone sought to appoint herself as Traute's personal

17   representative and to probate the April Will.  Raffone intentionally failed and refused to give the

18   Florida court a copy of the November Will, even thought she knew of it and had a copy of it.  The

19   Florida court held an evidentiary hearing and on April 28, 2008, vacated its order appointing

20   Raffone as the personal representative and admitting the April Will to probate.  On December 10,

21   2008, Campbell was appointed as curator in a limited capacity.  Campbell sought to have the

22   November Will admitted to probate.  Trial on the counter-petition to admit the November Will to

23   probate was set for June 2009.

24   Raffone and Campbell reached a compromise of their disputes to avoid the June 2009 trial

25   in the Probate Litigation.  A settlement agreement was drafted, but Raffone refused to settle it, and

26   again, significant litigation erupted.  The Florida court eventually entered a final judgment in favor

27   of Campbell affording him a money judgment of $2.5 million, plus all attorneys' costs and fees in

28   enforcing his rights under the settlement agreement (not all fees for all litigation).  Thereafter, on

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  April 30, 2010, after the Petition Date of the Debtor, but before Raffone's petition was filed, the

2  Florida judge in the Probate Litigation held Raffone in contempt, imposed a penalty in the amount

3  of $2,000 per day for failure to comply with the final judgment entered by that court, which sums

4  allegedly continue to accrue and will continue until the contempt is purged.

5      During the Probate Litigation, Campbell filed "Statements of Claim," to which Raffone

6  objected.  In response to the objections raised by Raffone, Campbell commenced the Florida Civil

7  Litigation.  In August 2008, Campbell attempted to use the Florida Civil Litigation to surcharge

8  Raffone, to compel Raffone to account for all probate estate assets, and to return to the probate

9  estate all assets that had been improperly transferred to Raffone before Traute's death.  The

10  Florida Civil Litigation was set for trial in 2009, but resolved as part of the settlement in the

11  Probate Litigation, referenced above.

12      Since the bankruptcy cases were filed, Raffone and the Debtor have had unfettered use of

13  an estimated $457,000 - $650,000 in gross rents per year.  Moreover, Raffone got a loan for

14  $8 million from the Plan Proponent and Raffone has refused and continues to refuse to account to

15  Campbell for the use of the loan proceeds.

16      On dates that are unknown to Campbell, Raffone used her influence over Traute to cause

17  Traute to transfer other assets to Raffone, including bank accounts, jewelry, stocks and real

18  property, with which Raffone purchased a Palm Beach, Florida condominium and a home in

19  Loxahatchee, Florida.

20      Campbell believes that Raffone has fraudulently transferred assets to herself, in violation

21  of the orders of the Probate Litigation, and in violation of Campbell's appointment as curator for

22  Traute's estate.  Campbell has filed a complaint seeking to determine that Raffone's debt to him is

23  non-dischargeable as to Raffone in her personal bankruptcy case ("Discharge Litigation").

24  Raffone has objected to the proof of claim filed by Campbell in the Raffone bankruptcy case.  The

25  bankruptcy court is likely to combine the Discharge Litigation, which is an adversary action, with

26  the claim objection, which is a contested matter.  In November 2010, the bankruptcy court granted

27  relief from stay to Campbell to pursue the Florida Probate Litigation to finality.

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

**B.    Principals/Affiliates of Debtor's Business.**

Claudia Raffone contends that she is the sole managing member of the Debtor.

Campbell contends that he is the sole managing member of the Debtor.

No court has ever determined with finality who is the owner of Nevada Star.  According to Campbell, on December 29, 2010, at the request of Raffone, the Florida District Court of Appeal entered an order of remand, for 30 days, to determine whether a portion of the Final Judgment entered in the Probate Litigation transferred ownership to Campbell, or instead was meant only to give Campbell a lien on Raffone's ownership interest in Nevada Star.  According to Campbell if ownership indeed transferred to Campbell, then Raffone may have incurred a significant taxable capital gain.  It is unknown as of the filing of this Disclosure Statement whether Raffone made an IRS Code Section 1398 short-year election after commencing the instant bankruptcy case by September 15, 2010.  Campbell believes that date is an immutable deadline.  According to Campbell if Raffone did not timely make that election and the above transfer is effective, then it appears Raffone personally and not her bankruptcy estate, will be liable for those capital gains.  According to Campbell, if Raffone did make the election timely, then any such gains would become a priority claim in her bankruptcy case and be paid ahead of the claims of certain other creditors.  The Plan settles this dispute by acknowledging Raffone's ownership of the entire membership interest of the Debtor and causing the Administrator to file a return for the post confirmation estate.

**C.    Management of the Debtor Before and After the Bankruptcy.**

Minuit was appointed by Judge Peter Sherwood of the New York Supreme Court by order entered on March 25, 2010.  Raffone and her counsel selected Minuit to manage the Property in her effort to prevent Campbell from taking control over the Property.  At a later date, Raffone came to distrust Minuit and expressed her desire to have Minuit removed.  Raffone never took any formal steps in Court to have Minuit removed, although initially she did oppose Madison's efforts to prevent Raffone from acting as a debtor in possession for the Debtor.  After the first hearing on the use of Madison's cash collateral, Raffone asserted no further objections to the use of rents from the Property.  She has continued her objections to Minuit throughout the bankruptcy cases.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

Bryan Cave LLP
120 Broadway, Suite 300
Santa Monica, California 90401-2386

1    Madison did not believe Raffone to be trustworthy or competent with respect to

2    management of the Property.  On three separate occasions (June 4, 2010 [Docket No. 31], June 15,

3    2010 [Docket No. 45] and August 27, 2010 [Docket No. 76]), Madison asked the Bankruptcy

4    Court to (1) lift the automatic stay to the extent necessary to permit Minuit to remain in

5    possession, custody and control of the estate's cash collateral, (2) excuse the requirement of

6    turnover by a custodian such as Minuit under 11 U.S.C. § 363 of the Bankruptcy Code, and

7    (3) authorize the use of Madison's cash collateral in connection with budgets that had been

8    approved by Madison for the upkeep, maintenance and protection of the Property (the "Excuse

9    From Turnover Motions").  Madison brought on the Excuse From Turnover Motions at the urging

10    of Minuit who expressed difficulties it was experiencing in managing the Property under

11    Raffone's direction.

12    Minuit informed Madison that critical repairs to the fire safety system and the erecting of

13    scaffolding to protect the public from falling pieces of the façade were necessary expenditures.

14    The Debtor and Raffone initially opposed any use of cash to protect the public, curiously insisting

15    that the masonry of the building would only fall on tenants using the courtyard and not on the

16    public street.  The Debtor and Raffone also opposed the retention of Minuit as the custodian of all

17    cash collateral, despite the order of a state court (described below) that a property manager other

18    than Raffone be in place.  The Debtor and Raffone ignored the rights of the tenants and caused

19    numerous complaints to be filed with the City of New York, leaving the Debtor liable for

20    thousands of dollars of fines and the need to retain an expeditor to resolve outstanding violations.

21    A list of the violations printed from the City of New York website can be accessed by any party in

22    interest.[4]  The Debtor and Raffone opposed the use of cash to pay for critical repairs to the fire

23    safety equipment in the building, insisting that such repairs were fabricated by Minuit and not

24    necessary.  The Debtor did not always timely pay employees and other regular maintenance and

25    _____

[4]    By accessing http://167.153.4.71/Hpdonline/provide_address.aspx  and inserting the street
26    address number (114) and street location (W. 86th Street) and hitting the search button, that should
bring parties  to the following page:
27    http://167.153.4.71/Hpdonline/select_application.aspx .  On the left hand margin, any party can
then clink the link entitled "All Open Violations."

28

1   repairs had gone unpaid.  Minuit also informed Madison that numerous leases were not timely

2   renewed under New York's rent stabilization law, some over a period of many years, leaving

3   insufficient funds to make any interest payment on the Note.  Apparently other vendors also went

4   unpaid, and at least 3 liens asserting demands for over $2.5 million have been recorded against the

5   Property in positions junior to Madison.  Accordingly, Madison felt that the bringing on of the

6   Excuse From Turnover Motions was necessary to preserve (i) the Property and (ii) any hope of a

7   sale that would generate proceeds in excess of Madison's claim.  The Debtor and Raffone did not

8   oppose the second and third Excuse From Turnover Motions.  All three Excuse From Turnover

9   Motions were granted by orders entered on July 13, 2010 [Docket No. 63], September 30, 2010

10  [Docket No. 139] and October 8, 2010 [Docket No. 144].

11          **D.      <u>Events Leading to Chapter 11 Filing.</u>**

12          Here is a brief summary of the circumstances that led to the filing of this Chapter 11 case:

13          <u>The Tenant Litigation</u>:  At some point in early 2009, a group of tenants engaged attorney

14  Ms. Catherine Grad to assist them in assuring regular repair and maintenance of the Property.  Ms.

15  Grad commenced an action against the Debtor and on May 27, 2009 (the "Tenant Litigation"), and

16  a Civil Court of the City of New York ordered Raffone to obtain a managing agent for the

17  Property that was <u>not</u> Raffone or her family or related parties.  That order further required the

18  Debtor to maintain $5,000 in a bank account in New York which in turn could be accessed by the

19  court appointed managing agent to pay for ongoing maintenance of the building, which includes

20  paying the superintendent (the ("Tenant Protection Order").  Raffone appears to have disregarded

21  the Tenant Protection Order, and the managing agent mentioned in the court order never signed

22  the order or managed the Property.  Instead, Raffone had her superintendant's wife (Vjollca

23  Lumaj) registered for a period of time as the managing agent, when in actuality there was no one

24  other than Raffone herself acting as the property manager.  Subsequent to the entry of the Tenant

25  Protection Order, Minuit was appointed as the managing agent by Judge Sherwood.  Since the

26  time of Minuit's appointment, the number of complaints by tenants has been dramatically reduced.

27  New complaints by tenants are now extremely low in number.

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

The Probate Litigation:       Prior to the commencement of this bankruptcy case, the Debtor and Raffone were involved in litigation in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, in Case No. 502008-CP-00346-XXXXMB, *In re Estate of Traute*, deceased (herein called the "Probate Litigation").  In the Probate Litigation, Raffone was locked in a tug of war with Campbell over ownership of the Property.  On February 5, 2010, the Circuit Court in Palm Beach County Florida entered a final judgment approving a transfer of "100% of Claudia Raffone's membership interest in Nevada Star, LLC" to Campbell ("Probate Order").  A summary of the Probate Litigation procedural history and facts believed to be relatively neutral and not in favor of either Raffone or Campbell, relating to that litigatios is set forth in paragraphs numbered 1-28 below.

1.       Raffone is the only child of her mother, Traute.

2.       Campbell is allegedly Raffone's mother's third husband.  Raffone disputes that fact as she contends that no certified marriage license has been proffered by Campbell.

3.       Raffone filed a Petition for Administration seeking her appointment as personal representative and the admission to probate of a Last Will and Testament executed by the decedent at the decedent's lawyer's office on April 11, 2003, devising the remainder of the estate to Raffone.

4.       Campbell filed a Petition for Administration seeking his appointment as personal representative and the admission to probate of a will allegedly prepared and executed by the decedent on November 14, 2003, devising the remainder of the estate to Campbell.

5.       Raffone contested the November Will on the basis of improper execution.

6.       In New York and Florida, Campbell sued Raffone to invalidate a gift made by the decedent in September 9, 2003 to Raffone of the Property.

7.       According to Raffone, the Property has been appraised for approximately $18 million dollars.

8.       Raffone and Campbell litigated Campbell's Counter-Petition of Administration in October of 2009, the parties settled all pending issues, executed a settlement agreement and the settlement agreement was approved by the Florida Court on October 21, 2009 ("Settlement

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1    Agreement"). The Settlement Agreement provided for Raffone's appointment as Personal

2    Representative and that Campbell would receive a different parcel of property, the co-operative

3    apartment located at 108 East 86th Street, Apt. 11N, New York, New York (the "Co-Op") owned

4    by Traute and $2.25 million dollars. Raffone contends that the Co-Op has a $1.8 million dollar

5    value. There is also a federal tax lien placed against the Co-Op, which must be satisfied by

6    Raffone under the Settlement Agreement. According to Campbell, that lien was recorded on

7    December 17, 2009 in the amount of $673,998.50.

8        9.      The Settlement Agreement also provided that Raffone would retain ownership of

9    the Property, and that Campbell would dismiss the Florida Civil Litigation and the Fraudulent

10   Transfer Litigation.

11       10.     This $2.25 million dollars included payment to the Gunster law firm for their claim

12   to more than one million dollars in attorneys' fees and costs. Counsel for Campbell has

13   represented that the amount due Gunster Yoakley has currently been reduced, presumably by

14   payments from their client, Campbell, or an agent of their client.

15       11.     The Settlement Agreement also provides for the use of security documents in favor

16   of Campbell in order to ensure payment of the $2.25 million dollars by April 1, 2010 ("Security

17   Documents"). The Security Documents were to be the subject of further negotiations and were to

18   include a pledge of Raffone's interests in the Debtor.

19       12.     The form of these Security Documents was not created and/or reviewed until at

20   least a month after the execution of the Settlement Agreement and was not finalized as to form

21   until late December 2009.

22       13.     At the time of the execution of the Settlement Agreement, it was contemplated by

23   all parties that Raffone would pay Campbell the $2.25 million dollars after sale, re-financing or

24   other transfer of ownership for profit, of the Property, but not later than April 1, 2010.

25       14.     The Property, both prior to and after the settlement, was subject to a first mortgage

26   in an amount exceeding $8 million dollars in favor of Madison. Thus, the Settlement Agreement

27   and the Security Documents were tailored in order to prevent an "event of default," under the first

28   mortgage and preserve Madison's priority.

15.     The Security Documents include a mortgage on Raffone's claimed Florida Homestead, a New York Judgment by Confession for $2.5 million dollars, a Pledge Agreement by Raffone to the membership interest in the Debtor and a first priority interest in an interest reserve account held by the first mortgagor, Madison, on the Property.

16.     Prior to the completion of the form of the Security Documents, but two months after the Settlement Agreement was agreed upon, at least verbally, a tax lien against the Defendant was placed on the Co-Op.  Pursuant to the Settlement Agreement, Raffone would have to satisfy the tax lien.  However, as stated above, the satisfaction of the financial obligation to Campbell by Raffone would be paid from the proceeds of the sale or re-finance of the Property, which was required to occur by April 1, 2010.

17.     With the tax lien pending on the Co-Op, execution of the Security Documents would have allowed Campbell to foreclose on his security interest (through the Security Documents and the default terms of the Settlement Agreement) long before April 1, 2010, the contemplated payment date.  Therefore, Raffone moved for an extension of time to satisfy the tax lien until April 1, 2010 and the Court denied same.

18.     After the denial of the extension request, Campbell requested Raffone sign the Security Documents.  Raffone did not sign, nor consent to the execution of, the Security Documents.  In response to Raffone not executing the Security Documents, Campbell moved the Florida Court to hold Raffone in contempt and the Court entered a contempt order and issued a writ of bodily attachment until such time as Raffone signed said documents which was granted.

19.     Raffone's counsel motioned the Florida Court to withdraw, which request was granted on February 1, 2010.

20.     Campbell filed a "Motion to Enforce Settlement Agreement, for Entry of Final Judgment in Favor of Henry Douglas Campbell and Against Raffone, Donald St. John, and the Debtor, and to Confirm and Establish the Security Required Under Settlement Agreement." ("Motion to Enforce Settlement Agreement").

21.     The Motion to Enforce Settlement Agreement requested that the Florida Court "deem" the Security Documents to be "signed," without Raffone's execution or consent to same,

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1    and grant Campbell the relief provided for in the Security Documents and further relief from the

2    Court itself.  While Raffone was not represented by counsel, a hearing on the Motion to Enforce

3    Settlement Agreement was held on February 5, 2010.

4        22.    On February 5, 2010, the Court entered a Final Judgment (the "Florida Final

5    Judgment").  Raffone disputes the factual findings in the Final Judgment.

6        23.    The Florida Final Judgment provided in pertinent part:

7            a.    As a matter of law, Campbell was entitled to specific performance of the

8    Settlement Agreement;

9            b.    The Florida Final Judgment was entered on behalf of Campbell and against

10   Raffone and the Debtor, jointly and severally, in the amount of $2.5 million dollars;

11           c.    Campbell was entitled to immediately record the Florida Final Judgment in

12   any and all jurisdictions;

13           d.    The Security Documents were deemed executed by the parties effective the

14   date of the Florida Final Judgment and Campbell was entitled to all of the rights afforded by the

15   Security Documents;

16           e.    100% of Raffone's membership interest in the Debtor was transferred to

17   Campbell, effectively immediately, and Campbell was entitled to immediate possession of all its

18   books, records, etc, including rent rolls and the right to immediately begin collecting rent from the

19   tenants in the Property;

20           f.    The Debtor was directed to immediately issue a certificate for 100% of the

21   membership interests to Campbell;

22           g.    The Department of Housing and Community Renewal for the City of New

23   York was authorized and directed to provide Campbell with records of the registered rents for the

24   Property;

25           h.    Campbell was assigned all the rights that the Debtor and/or Raffone had in

26   the interest reserve account with Madison;

27           i.    Campbell was entitled to a mortgage in the principal amount of $400,000 on

28   Raffone's Florida Homestead property; and

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1    j.    Campbell was entitled to recover the attorneys' fees and costs he incurred in

2  connection with enforcing his rights under the Settlement Agreement.

3    24.    Campbell began informing tenants of the Property and other New York entities of

4  his "ownership" of the Property under the Florida Final Judgment.  Raffone contends that

5  Campbell began these communications with tenants before the Florida Final Judgment became

6  final as a matter of law.  By letter dated February 5, 2010, Campbell notified the tenants of the

7  Property "that 114 W. 86th Street is now owned by Henry Douglas Campbell," "as owner he has

8  appointed DRJ 175 LLC as the new management company for [the] property represented by

9  Mr. Schreiber" and that "all future rents will be made to DRJ 175 . ..".

10    25.    On February 16, 2010, Raffone asked her probate counsel to re-appear in the

11  matter.  Raffone timely filed a Motion for Rehearing on Order Granting Final Judgment on

12  Settlement Agreement and Confirming and Establishing Security Interests and Rights ("Motion

13  for Rehearing") on February 16, 2010.  Campbell provided the Court with a response to Raffone's

14  Motion(s) for Rehearing and continued to claim he owned the Property.  The Motion for

15  Rehearing was denied by the Florida Court on February 25, 2010.

16    26.    Campbell also, through the use of the Florida Final Judgment, levied Raffone's

17  personal and the Debtor's bank accounts at Chase Bank, Bank of America and Citibank.

18    27.    Due to Campbell's and Raffone's actions, many tenants stopped timely paying rent

19  and the upkeep and maintenance of the Property suffered.  The Debtor brought some lawsuits

20  against defaulting tenants in landlord-tenant courts in New York.  Raffone contends that

21  Campbell's intervention during that time prevented Raffone and the Debtor from enforcing the

22  leases which were then in effect and rental income was lost.

23    28.    Raffone filed an appeal of the Florida Final Judgment on February 26, 2010, as

24  Case Number 4D10-865 in the Fourth District Court of Appeal.  Raffone also filed a motion for a

25  stay pending appeal on March 12, 2010 ("Motion for Stay Pending Appeal").  Although the appeal

26  case filing fee was paid on March 5, 2010, ultimately the appeal was not prosecuted because

27  (1) Raffone ran out of money and her lawyers were no longer willing to work for a promise of

28  future payment, and (ii) the New York Sale Litigation (described below) was commenced.  The

1    Motion for Stay Pending Appeal required the posting of a bond, which Raffone either was unable

2    or unwilling to post.  Raffone's bankruptcy counsel concedes that while the filing of the

3    bankruptcy case of Raffone operates as a stay, it does not override the requirement that Raffone

4    post a bond in the pending appeal.  The failure to post a bond eventually caused the New York

5    court to refuse to stay enforcement of the Florida Final Judgment.  Campbell contends that

6    Raffone did not pursue the appeal of the Florida Final Judgment because the Florida Probate

7    Litigation judge was so angry at Raffone that she knew she was certain to lose the appeal.

8    Raffone disputes that position.

9        <u>The Loan from Madison</u>:        On or about September 23, 2008, the Debtor made, executed

10    and delivered a promissory note in the form of a Mortgage Note (the "Note"), in favor of Madison

11    or Madison's successors in interest in connection with a loan in the original principal amount of

12    $8,000,000.00.  The loan made by Madison is subject to the express terms and conditions of the

13    Note, as well as those terms and conditions set forth in other related loan documents, (collectively,

14    the "Pre-Petition Loan Documents").  Under the Note, Debtor was to make monthly interest

15    payments to Madison and pay all real estate taxes and other assessments levied against the

16    Property.  The Pre-Petition Loan Documents include, among other things, a recorded security

17    interest against the Collateral (described below), among other documents.

18        In accordance with the Pre-Petition Loan Documents, the Debtor granted Madison a

19    security interest in the Property, in addition to any rents, issues, profits and proceeds thereof (the

20    "Collateral").  Madison duly perfected such security interest(s) by, promptly recording the

21    Mortgage and Security Agreement ("Mortgage") in the Official Records of the Office of the City

22    Register of the City of New York on or about October 3, 2008 as CRFN No. 2008000392051, and

23    accordingly, holds a valid and enforceable, unavoidable and perfected first priority security

24    interest in and lien on all of the Debtor's assets listed therein.  Madison also recorded a UCC-1

25    against the Collateral and recorded a separate Assignment of Leases and Rents.

26        Raffone personally guaranteed the Loan.

27        Prior to the Petition Date, a default in the payment of pre-petition real estate taxes pursuant

28    to Sections 5 and 21 of the Mortgage occurred on July 1, 2009, so on December 29, 2009,

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1   Madison sent notice to the Debtor demanding a cure in the failure to pay over $209,000 of pre-

2   petition real estate taxes.  The Debtor defaulted under the loan by failing to pay the pre-petition

3   real estate taxes in July 2009, and thereafter failed to make interest payments due for the months

4   of December 2009 and January 2010.  The entry of the Probate Order was a further event of

5   default.  Accordingly, on February 23, 2010, Madison sent notice to the Debtor advising of these

6   defaults and accelerating the debt.  On or about February 10, 2010, Madison received a written

7   request from counsel to Campbell seeking a payoff figure so that it could satisfy the Mortgage and

8   prevent a foreclosure of Campbell's interests therein.  No payoff has been received by Madison.

9        Madison obtained an appraisal of the Property in February 2010 which stated a value of

10  $13.8 million.  Madison does not know the actual value of the Property but believes it will exceed

11  $13.8 million.  Madison's claim as of April 30, 2011, is approximately $10,750,000 including late

12  fees, some of the attorneys' fees, foreclosure costs and other related expenses.  Additional

13  amounts are continuing to accrue, including interest at the rate of $5,055.34 per day.  No payments

14  have been made to Madison in the last 16 months because all cash flow was used to maintain the

15  Property and pay for repairs and costs of operation, excepting only a small amount reserved for

16  payment of post petition taxes.  Neither pre-petition nor post-petition real estate taxes have been

17  paid.  Madison believes that the sum of at least $500,000 is owed for pre-petition and post-petition

18  real estate taxes and there is an insufficient amount of cash on hand (roughly $275,000 inclusive

19  of the tax account, tenant deposits, payroll and general funds) to pay that amount.

20       The New York Sale Litigation.        In March 2010, soon after the appeal of the Florida

21  Final Judgment was filed in the Fourth District Court of Appeal, the Debtor and Raffone retained

22  the firm Beys Stein to commence litigation in the Supreme Court of the State of New York that

23  would facilitate a sale of the Property and prevent Campbell from taking it under the Florida Final

24  Judgment (the "New York Sale Litigation").  At the inception of the New York Sale Litigation,

25  Minuit was appointed to act as the property manager for the Property by the Honorable Judge

26  Peter Sherwood of the New York Supreme Court by order entered on March 25, 2010.  Judge

27  Sherwood indicated that he did not wish to have the Property or the tenants suffer while he

28  resolved the dispute over the Property between Raffone and Campbell.  Accordingly, since that

1    time on March 25, 2010, Minuit acted as the custodian in control of the Property, collecting rents

2    and paying expenses of operation as consented to by Madison.  In December 2010, Minuit was

3    removed and a state court receiver took over operations.  Their handling of funds overlapped

4    through January 2011 when Minuit turned over all funds to the state court receiver.

5        During the New York Sale Litigation, Judge Sherwood entered orders, dated March 25,

6    2010 (granting a stay of the Final Florida Judgment and ordering the posting of a bond), April 8,

7    2010 (requiring that any sale of the Property go through him and extending the time to post a

8    bond), April 23, 2010 (further extending the time for Raffone to post a bond), and April 27, 2010

9    (vacating the stay for the failure of Raffone to post a bond).  This April 27, 2010 order was

10   deemed void by this Bankruptcy Court, Judge Samuel Bufford presiding, who later found it to

11   have violated the bankruptcy stay of 11 U.S.C. § 362(a).  This Bankruptcy Court, Judge Peter

12   Carroll, has subsequently held that the finding by Judge Samuel Bufford was non-binding dictum.

13       Immediately prior to the Petition Date, Judge Sherwood set a hearing on the proposed sale

14   of the Property.  Michael Beys of Beys Stein submitted an affidavit stating that his firm assisted

15   the Debtor in locating buyers for the Property, and that approximately five buyers in the price

16   range of $15,000,000 to $15,500,000 were located, each of whom were prepared to close cash

17   sales in a relatively short period of time.  Before Judge Sherwood could conduct an auction of the

18   Property, the Debtor's petition in bankruptcy was filed.

19       The Foreclosure Litigation.    Prior to the Debtor's bankruptcy, Madison commenced

20   litigation in the Supreme Court of the State of New York, County of New York, Index No.

21   103172/10, *Madison Realty Capital, L.P.. v. Nevada Star, LLC, et al.* ("Foreclosure Litigation").

22   In connection with the Foreclosure Litigation, Madison made application to appoint a receiver

23   over the Property to secure and protect the cash collateral and cause all rents, issues and profits to

24   be used to maintain the Property, and pay expenses associated therewith, including real estate

25   taxes that are accruing as a senior lien ahead of Madison.  On April 16, 2010, the Supreme Court

26   for the State of New York, County of New York, granted an order appointing Gerald Kahn of

27   Smith Buss & Jacobs as the receiver ("Receiver").  At that time, the Receiver never took

28   possession of the Property due to the filing of the bankruptcy petition and the triggering of the

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

1 | automatic stay.  The foreclosure of the Property by Madison and the sale of the Property by Judge

2 | Sherwood were stayed by the Debtor's commencement of the Debtor's case on April 26, 2010.

3 | The Debtor never filed an answer in the Foreclosure Litigation and accordingly, no sale was set.

4 | On December 2, 2010, Madison moved the Bankruptcy Court for relief from stay to

5 | continue litigating the Foreclosure Litigation, which motion was granted by order entered on

6 | November 9, 2010, and became effective fourteen days later on November 23, 2010.  Following

7 | entry of that order, the Foreclosure Litigation was reactivated and the appointed receiver, Gerald

8 | Kahn ("Kahn") took over from Minuit in managing the Property.  Some of the January 2011 rents

9 | were collected by Minuit, and some were collected by the Receiver.  Both Minuit and the Receiver

10 | prepared January MORs.

### E.    Significant Events During the Bankruptcy.

#### 1.    Bankruptcy Proceedings.

The following is a chronological list of significant events which have occurred during this case:

#### a.    Bankruptcy Case Matters:

1. On April 26, 2010 the Debtor filed its voluntary chapter 11 petition.

2. On May 5, 2010, Raffone filed her voluntary chapter 11 petition.

3. Three Excuse From Turnover Motions were granted by orders entered on July 13, 2010 [Docket No. 63], September 30, 2010 [Docket No. 139] and October 8, 2010 [Docket No. 144]..

4. On October 14, 2010, the Bankruptcy Court entered orders consolidating the cases of the Debtor and Raffone administratively [Docket Nos. 29 and 146].

5. On November 9, 2010, the Bankruptcy Court entered an order granting Campbell relief from stay to pursue a final judgment in the Florida litigation matters [Docket No. 176].

6. On November 9, 2010, the Bankruptcy Court entered an order granting Campbell the right to take the 2004 examination of Raffone [Docket No. 177].

7. On December 3, 2010, the Bankruptcy Court entered an order granting Madison relief from stay to pursue the Foreclosure Litigation [Docket No.  190].

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

8. On March 30, 2011, the Second Amended Plan and Second Amended Disclosure Statement were filed with the Court [Docket Nos. __ and __].

9. On _____ 2011, the Bankruptcy Court entered an order finding that this Disclosure Statement contained sufficient information to permit Madison to seek votes in favor of the Plan.

### b.    Other Legal Proceedings.

Other than the foregoing bankruptcy court matters and bankruptcy court adversary proceedings, the Debtor is involved in various legal proceedings relating to the tenant's obligations to pay rent in a timely fashion. Some of those actions may lead to evictions of non paying tenants and judgments for back due rent.

### 2.    Actual and Projected Recovery of Preferential or Fraudulent Transfers.

The debtors' Plan contemplates only partial payment of all allowed claims. Consequently, the Committee, some creditors and interested parties believe that some benefit can be derived from the pursuit of preferential transfer actions. Pursuing such actions will certainly increase the administrative expenses of the estate. Alternatively, waiving all rights to pursue avoidance power actions in exchange for discounted claim allowance could be equally beneficial to the estate, particularly since litigation can involve delay and significant cost. Thus, preference and fraudulent transfer actions brought by the IRS will be settled by the Plan.

This Bankruptcy Court, Judge Samuel Bufford, also entered an order on July 12, 2010 [Docket No. 6] that barred the filing of any avoidance power actions after October 1, 2010, and none were filed by that date. There is a dispute as to whether that order only applies to the Debtor or whether all parties are bound by such order. Creditors in Classes 5-8 and certain interested parties contend that they were never served with a notice of the bar date or of the possible entry of such an order. The Plan proposes to enforce that order by affirming that the time frame in which avoidance power actions may be filed against any creditors, Raffone or the estate has expired. All such rights, if any exist, are waived and released.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

3.    **Procedures Implemented to Resolve Financial Problems.**

To attempt to fix the problems that led to the bankruptcy filing, Madison has proposed the following procedures:  The Administrator for the post confirmation estate will have the obligation to retain Eastern Consolidated as the estate's real estate broker to market and sell the Property in accordance with the settlement outlined in the Plan.  Under that settlement, the Administrator will ask Judge Peter Carroll to conduct an auction of the Property on May 4, 2011, with respect to the stalking horse proposal attached to the Plan at Exhibit E.  The overbid procedure for the sale of the Property is set forth in Section IV.E.4 below.

The terms of the settlement are as follows:

a.    All parties agree to cooperate and facilitate a sale of the Property at the earliest possible date.

b.    All real property taxes in Class 1 shall be paid or reserved for.

c.    On behalf of the Debtor's estate, Madison shall negotiate an asset purchase agreement with Bernstein Real Estate as the proposed stalking horse bidder.  On account of its secured claim in Class 2, Madison shall receive a flat amount of $10,750,000 plus all interest, fees and other charges from April 30, 2011 until closing, plus all attorneys' fees and costs incurred from February 1, 2011 until closing.  In the event the sale closes on or before May 31, 2011, Madison shall agree to discount its claim by (i) the amount of all attorneys' fees incurred in February 2011, and (ii) the difference between the default interest rate and the nominal interest rate for the time period April 30, 2011 through May 31, 2011.  Madison will forbear from holding an actual foreclosure sale of the Property until June 30, 2011.  However, nothing in the Plan shall require Madison to forbear from exercising any other remedies, including taking of all steps up to the point of the holding of the sale.

d.    All administrative and non classified claims shall be paid in full or reserved for pending applications.

e.    The wage claim shall be paid the full $10,000 in priority with the balance of the claim to participate in the unsecured class.

f.      The tenant security deposits shall be fully funded from cash collateral or proceeds of sale to the Buyer.

g.      The Receiver shall turn over the Property and the cash collateral to the Administrator upon confirmation of the Plan.

h.      The sum of $35,000 shall be set aside for the Administrator to fulfill his duties under the Plan.  This amount shall not include the sums necessary for the Administrator to operate the Property prior to closing.

i.      Creditors in Classes 3-8 and 11 may receive the fixed amount set forth on Exhibit C, but the actual payment to such creditors shall be plus any excess funds or minus any additional liabilities, in the pro rata percentages set forth on Exhibit C.

j.      Creditors in Classes 9-10 shall be treated as set forth in the Plan.

k.      Creditors in Class 12 shall be paid after all claims in senior classes are paid in full.

l.      Interest holders in Class 13 shall retain all rights and therefore is unimpaired.

**4.**    **Current and Historical Financial Conditions.**

The Debtor's most recent historical pre-petition complete financial statement has not been located and is not disclosed.

The Debtor's bankruptcy schedules and Court filings do not clearly disclose all of the Debtor's assets as of the petition date and so a list of known assets is included within Exhibit "A" to the Plan.  The Debtor's MORs are available upon written  request to the Proponent's counsel.

**III.**    **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS IN THE DEBTOR'S ESTATES**

**A.**    **General Overview**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority of payments as provided in the Bankruptcy Code.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive under the Plan.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**B.    Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Proponent has not placed the following claims in a class.  The treatment of these claims is provided below.

**1.    Administrative Expenses**

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code Section 507(a).  The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.  This Plan provides that the administrative creditors are paid in their entirety on the Effective Date.

The following chart lists all of the known § 507(a) administrative claims in the Nevada Star estate and their treatment under the Plan:

| Name | Amount Owed (exclusive of retainer deposits) | Treatment |
|---|---|---|
| Law Offices of Michael Berger (Nevada Star fees and expenses) | $90,000 (est.) (accrued to date at $80,779.86) | Total payment = allowed amount.  Paid from retainer, and remaining portion shall be paid on the Effective Date from the proceeds of escrow of the Property |
| Lewis R. Landau (Counsel in Nevada Star case for the Official Unsecured Creditors' Committee ("Committee")) | $40,000 (est.) (accrued to date at $21,400) | Total payment = allowed amount.  Paid on the Effective Date from the proceeds of escrow of the Property |
| Clerk's Office Fees (Nevada Star) | TBD (nominal), est. at $650.00 | Paid in Full on Effective Date from the proceeds of escrow of the Property |
| Office of the U.S. Administrator Fees (Nevada Star) | Current | Paid in Full on Effective Date from the proceeds of escrow of the Property |
| Internal Revenue Service ("IRS") capital gains tax | Potentially as high as $3.53MM | Partially paid as agreed in this Plan, as a settlement of litigation rights only, and proceeds applicable to reduce the tax owed, from the proceeds of escrow of the Property |
|  | TOTAL $TBD |  |

To the extent that the Law Offices of Michael Berger (the "Berger Firm") received a retainer for its work in the Nevada Star case from the cash collateral of Madison without its consent, creditors will not pursue recovery of such cash collateral if the Plan is confirmed.

1  Madison believes $25,000 of its cash collateral was paid to the Berger Firm on account of the

2  Nevada Star case.  The Berger Firm contends that its retainer in the Debtor's case was paid from

3  the proceeds of the loan obtained from Links Capital Partners, LLC, et al.; Defined Benefit

4  Pension Plan Trust.

5       To the extent that the Berger Firm received a retainer for its work in the Raffone case from

6  the cash collateral of Madison without its consent, creditors will not pursue recovery of such cash

7  collateral in the Raffone estate if the Plan is confirmed.  Madison believes $20,000 of its cash

8  collateral was paid to the Berger Firm on account of the Raffone case.  The Berger Firm contends

9  that its retainer in the Raffone case was paid from the proceeds of the loan obtained from Links

10  Capital.

11          **2.    <u>Court Approval of Fees Required.</u>**

12       The Court must approve all professional fees listed in this chart.  For all fees except

13  Clerk's Office fees and U.S. Trustee's fees, the professional in question must file and serve a

14  properly noticed fee application and the Court must rule on the application.  Only the amount of

15  fees allowed by the Court will be required to be paid under this Plan.  To the extent any fees are

16  paid prior to Plan confirmation, they will not be paid twice.  All pre-confirmation payments will

17  be taken into account before the final payment is determined.

18       The Plan provides for the appointment of the Administrator.  Fees and expenses arising out

19  of the Nevada Star case and owed to the Berger Firm and Lewis R. Landau will be paid (after

20  application of any retainer that is not disgorged) their allowed amount on the Effective Date

21  (allowing for sufficient time to permit the Administrator to issue checks).  The total paid shall not

22  exceed 100% of the final allowed amounts.  Such payments are contingent upon their final fee

23  applications having been heard, the final amount allowed, and ordered paid from available funds

24  and no stay pending appeal is obtained as of that date.  The Administrator shall pay these amounts

25  from the escrow closing at the sale of the Property.  The Administrator shall be permitted to

26  withhold any payment to administrative creditors until allowed by final Court order.

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

1    Madison authorizes the use of its cash collateral in an amount required to pay the Nevada

2    Star Clerk's Office Fees and the Office of the U.S. Trustee's Fees on the Effective Date or as soon

3    thereafter as the Administrator can do so.

**3.    Priority Tax Claims.**

5    Priority tax claims are certain unsecured income, employment and other taxes described by

6    Code Section 507(a)(8).  The Code requires that each holder of such a § 507(a)(8) priority tax

7    claim receive on account of such claim regular installment payments in cash of a total value as of

8    the effective date of the Plan equal to the allowed amount of such claim over a period ending not

9    later than five (5) years after the date of the order for relief, and that such payment be achieved to

10   cause the payment to be in a manner not less favorable than the most favored non-priority

11   unsecured claim provided for by the Plan.

12   The Debtor is not known to have any Section 507(a)(8) priority tax claims to the IRS or to

13   the  New York State Dept of Taxation and Finance.  Under this Plan, the Administrator must pay

14   each Section 507(a)(8) priority tax claim, if any, in full.

**C.    Classified Claims and Interests.**

**1.    Classes of Secured Claims.**

17   Secured claims are claims secured by liens on property of the estate.  The following charts

18   list classes 1-7 containing Debtor's secured pre-petition claims and their treatment under this Plan,

19   Classes 2-8 will be treated as secured at the time of final distribution, but will be paid in

20   accordance with an agreed upon settlement that provides for a flat amount plus additional accruing

21   charges for interest or fees (Madison) or a formula (Classes 3-8), as set forth in <u>Exhibit C</u>.  There

22   is no guarantee of the amount that creditors in Classes 3-8 will receive.  A significant portion, and

23   potentially all, of claims in Classes 4-8 are believed to be undersecured or wholly unsecured.  As

24   part of the settlement set forth in this Plan, the complaint filed by the IRS to pursue avoidance

25   power actions against any creditor in such Classes 4-7 whose liens were all recorded in the 90

26   days immediately prior to the filing of the Debtor's voluntary petition shall be dismissed with

27   prejudice within 5 business days after receiving the initial settlement payment described below.

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 1 | Secured claim of senior secured real estate taxes | No | Yes Claim, less penalties, paid in full at the close of escrow. | • Pymt interval = Single; see means for effectuating the plan at section III(D) hereof. |
| | • Name= New York City Department of Finance | | | • Pymt amt/interval = Allowed amount of claim/one payment. |
| | • Collateral description = Debtor's Property. | | | • Balloon pymt = No. |
| | • Collateral value = $18MM | | | • Begin date = on Effective Date |
| | • Priority of security int. = first | | | • End date = Final determination of allowed amount of claim. |
| | • Principal owed = approx $1,072,709.71 (includes known interest and penalties through 1.1.11)[5] | | | • Interest rate % = statutory<br>• Penalties will not be paid as a Class 1 claim but will be paid as a Class 12 claim |
| | • Pre-pet. Arrearage amount = $unknown. | | | • Total payout = 100% of allowed amount of claim excluding penalties |
| | • Post-pet. Arrearage amount = $unknown. | | | • Treatment of Lien = Lien terminated and extinguished upon close of escrow, transferred to proceeds until final determination of claim. |
| | • Total claim amount = approx $1,072,709.71 (includes known interest and penalties through 1.1.11) | | | Only allowed amount of claim, after appeal, and without penalties or interest on penalties, will be paid in Class 1. |

Under this Plan, the payment to creditors in Class 1 shall be paid at the close of escrow. Penalties or interest on penalties of the Class 1 claim will be paid in Class 12. Upon payment of Class 1, less penalties and interest on penalties, the tax lien of the New York City Department of Finance shall be released. Any right to pursue an appeal against the New York City Department of Finance, reducing the tax obligation of the Debtor shall vest with the United States.

---

[5]     Campbell believes this claim may only be allowed in a maximum amount of $459,070 because a proof of claim was filed by this claimant in that amount. Madison however believes that a higher amount is warranted for purposes of disclosure as (i) the filed claim only applies to the second half of 2009 and the first half of 2010, and additional amounts have accrued since that time, and (ii) the creditor's website states this higher amount. The IRS, who will receive an assignment of this right to seek a refund of any overpayment of the claim from the Administrator, may undertake efforts to reduce the amount of the claim. Accordingly, the ultimate amount remains uncertain.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 2 | Secured claim of senior secured lender holding voluntary lien | No | Yes<br>Claim paid in full at the close of escrow. | • Pymt interval = Single; see means for effectuating the plan at section III(D) hereof. |
| | • Name= Madison Realty Capital, L.P. | | | • Pymt amt/interval = Allowed amount of claim/one payment, pursuant to payoff demand submitted to escrow. |
| | • Collateral description = Debtor's Property. | | | • Balloon pymt = No. |
| | • Collateral value = $18MM | | | • Begin date = Close of escrow |
| | • Priority of security int. = second (recorded 9.23.08) | | | • End date = Close of escrow. |
| | • Principal owed = $7,583,012.02 | | | • Interest rate % = contract rate of 24%, reduced to 12.75% from April 30 to May 31, 2011 only in event payment occurs prior to May 31, 2011 |
| | • Pre-pet. Arrearage amount = $1,039,943.10.+ | | | • Total payout = 100% of settled amount of claim, less agreed upon reduction from Exhibit C, if paid by no later than May 31, 2011. |
| | • Post-pet. Arrearage amount = at least $1,943,107.88 as of March 31, 2011. | | | • Treatment of Lien = Lien terminated and extinguished upon payment. |
| | • Total claim amount = flat settlement amount of $10,750,000 as of April 30, 2011, plus amounts accrued after April 30, 2011 for interest and fees and after February 1, 2011 for attorneys' fees and costs. | | | If paid on or before May 31, 2011, then Madison will agree to a discount of its claim payment amount, which would then be $10,750,000, plus accrued interest at nominal rate for month of May 2011, plus any amounts actually incurred and billed in attorneys fees from March 1, 2011 through closing. |

Madison shall be paid the agreed upon settlement amount from the close of escrow upon submission of a payoff demand to the title company selected by the Administrator.  Madison shall provide in its payoff demand a request for the sum of $10,750,000.00 as the flat the amount owed under the settlement at Exhibit C, plus all interest fees and other charges under its loan documents from April 30, 2011 until closing, plus all attorneys' fees and costs from February 1, 2011 until closing.  In the event the sale closes on or before May 31, 2011, Madison shall agree to discount its claim by (i) the amount of all attorneys' fees incurred in February 2011, and (ii) the difference

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

between the default interest rate and the nominal interest rate for the time period April 30, 2011

through May 31, 2011.  Madison will forbear from holding an actual foreclosure sale of the

Property until June 30, 2011.  However, nothing in this Plan shall require Madison to forbear from

exercising any other remedies, including taking of all steps up to the point of the holding of the

sale.

The Administrator shall have no right to contest the payment or amount of the Madison

payoff demand.  The general mutual releases set forth in this Plan shall be effective upon entry of

a final confirmation order. The Administrator is encouraged, but not required, to cause the

payment of the Class 2 claim in the most expeditious manner possible so as to preserve as much of

the value of the proceeds for the benefit of other interest holders herein.

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 3 | Secured claim of mechanic's lien holder | No | Yes 100% of allowed claim is paid in full on close of escrow | • Pymt interval = One, full payment at close of escrow. |
|  | • Name= Ponichtera Contracting[6] |  |  | • Payment amount is fixed at allowed amount of claim |
|  | • Collateral description = Debtor's Property. |  |  | • Balloon pymt = No. |
|  | • Collateral value = $18MM |  |  | • Begin date = Close of escrow, or as soon thereafter as funds are available. |
|  | • Priority of security int. = third (recorded 2.11.09) |  |  | • End date = Close of escrow. |
|  | • Principal owed = $21,000 |  |  | • Interest rate % = none |
|  | • Pre-pet. Arrearage amount = $12,017.29. |  |  | • Total payout = est. 100% of allowed amount of claim with credit for all payments previously made. |
|  | • Post-pet. Arrearage amount = as accrued by law. |  |  | • Treatment of Lien = Lien terminated and extinguished upon payment. |
|  | • Total allowed claim |  |  | Payment will be less if any portion |

---

[6]    Raffone disputes the claim of Ponichtera Contracting on the grounds that Ponichtera never filed a proof of claim, and that Ponichtera may have been paid in full for unfinished services with respect to the kitchen and the bathroom in Unit 17A. Madison believes the claim must be addressed in the Plan as the failure to file a proof of claim does not cause Ponichtera to lose its *in rem* rights, only its *in personam* rights.  Nothing in the order entered on July 12, 2010 at Docket No. 6, precludes the Administrator from determining and paying the *in rem* amount of this claim post confirmation and the Administrator shall have the authority, in a court of applicable jurisdiction, to determine the actual amount prior to any payment.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| | amount = $32,017.29 waiving all amounts accrued by operation of law, if any, paid at 100% | | | of claim previously paid by Debtor, Raffone or any custodian or receiver and less any amount which was not actually incurred by Ponichtera.  Actual payment will be after credits are applied. |

### Statement regarding Classes 4 Through 8 and 11

Each of the claims in Classes 4 through 7 allegedly were recorded as liens against the Property during the 90-day window immediately prior to the commencement of the Debtor's bankruptcy case.  Certain creditors have contended that the recording of UCC-1 statements was not sufficient to attach a lien to real property, or that other New York law was not followed sufficiently to create a lien.  In addition, absent the settlement set forth in this Plan, each creditor in Classes 4 through 7 is potentially subject to avoidance powers by the Administrator, Committee, creditor or interested party who could invalidate the lien or determine that the claim amount or the security were preferential or fraudulent transfers without reasonably equivalent value.  The following treatment for each claim in Classes 4 through 8 has been agreed upon as part of a settlement.  If the confirmation order becomes a final order, then all litigation as to the dollar amount and lien priority against *the Debtor's estate* shall be deemed resolved.  Notwithstanding the entry of a final confirmation order, nothing herein shall prevent Raffone from continuing to litigate with Henry Douglas Campbell as to litigation outside the bankruptcy court or his allowed claim amount in the Raffone estate.

Litigation concerning the Class 4 claim has persisted for many years and does not appear likely to resolve soon.  Even if this Plan is confirmed, Madison expects that litigation concerning the Class 4 claim will continue both under state law and in the bankruptcy court as to the allowed amount against the Raffone estate.  The settlement set forth in this Plan are the result of creditors' belief that litigation regarding the secured nature of the claims in Classes 4-7 is further likely, including a claim raised, but not yet filed, by the IRS asserting that the transfer of the Property from Raffone to the Debtor was a fraudulent transfer.  As part of the settlement set forth in this

1  Plan, the IRS shall dismiss with prejudice its current adversary proceeding (Docket No. 2:11-ap-

2  1759-PC) within 5 business days after receipt of the initial settlement payment described below

3  and refrain from bringing any litigation that shall delay the implementation of the Plan described

4  herein.  The United States intends to apply its payment under this Plan in full satisfaction of any

5  capital gains arising from the sale of the Property.  The creditors in Classes 4-7 dispute the

6  contentions raised in the descriptions above.

7       The Administrator shall have no right to contest the payment or amount of the claims in

8  Classes 4 through 8 or the claim of Fox Rothschild in Class 11.  The general mutual releases set

9  forth in this Plan shall be effective upon entry of a final confirmation order.

10       The actual treatment of all claims in Classes 4-8 and 11 is set forth on <u>Exhibit C</u>.  Creditors

11  on <u>Exhibit C</u> who have a percentage figure listed in the far right column shall share in the upside

12  of any additional funds for distribution and share in the risk that lesser funds will be available, in

13  the stated percentages set forth for each creditor.  The payment amount on the claims in Classes 4-

14  8 is not guaranteed and will be finally determined by the (i) value at which the Property sells,

15  (ii) amount of money that the Administrator recovers in the liquidation of assets, (iii) amount of

16  the claims of a higher priority, (iv) the date on which payment to senior creditors is made, (v) the

17  actual closing date on the sale of the Property, (vi) the amount of fees and interest charged by

18  Madison as set forth above, and (vii) the actual amount of administrative expenses allowed by the

19  Court and further incurred by the Administrator or owed under the Plan, including for operations

20  of the Property.  The payment amount on the claims in Classes 2-8 and 11 will not be finally

21  determined by the outcome of any litigation that has been or may be brought.  The Administrator

22  shall make the payment to Classes 2-8 and 11 as soon as reasonably practical but in no event later

23  than 10 business days after Closing.

24       The Administrator shall be entitled to make two payments to creditors holding claims in

25  Classes 4-8 and 11.  The first payment should be as large as possible reserving sufficient funds for

26  the Administrator to perform his obligations under this Plan.  The second payment shall be the

27  balance of funds on hand at the closing of the estate.  For purposes of reservation of funds for

28  senior classes, once the Administrator has paid Classes 1-3 and all reserved for or paid all non

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  classified or administrative claims, including the wages and tenant deposits, then payments must

2  begin pro-rata to Classes 4-8 and 11.

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 4 | Secured claim of involuntary judgment lien holder | No | Yes<br>Flat settled amount of claim is paid in full in two payments | • Pymt interval = Two; see means for effectuating the plan at section III(D) hereof. |
| | • Name= Henry Douglas Campbell ("Campbell") | | | • Pymt amt/interval = Fixed allowed amount of claim paid via two payments. First payment est. at $3M and second payment determined by formula described below |
| | • Collateral description = Debtor's Property, plus second priority on Raffone's Florida house, and disputed ownership or lien interest on membership interests of Debtor | | | • Balloon pymt = No. |
| | • Collateral value = $18MM | | | • Begin date = Close of escrow, or as soon thereafter as funds are available. |
| | • Priority of security int. = fourth (recorded 2.6.10) as to Debtor's Property | | | • End date = Close of estate, or as soon thereafter as actual final cash for distribution can be determined. |
| | • Principal owed = $2.25MM to $4.0MM | | | • Interest rate % = none |
| | • Pre-pet. Arrearage amount = unknown. | | | • Total payout = $3,000,000 est.. |
| | • Post-pet. Arrearage amount = Unknown. | | | • Treatment of Lien = Lien terminated and extinguished upon close of escrow, with lien to transfer to proceeds until paid by Administrator. |
| | • Total claim amount = estimated $4 million as of April 30, 2011 | | | • Actual payment will be in accordance with settlement at Exhibit C. |

24  Campbell believes that, if litigated, his claim will be allowed by Court order at no less than

25  $2.5 million and likely closer to $3.5 million and possibly as high as $4 million. He also asserts a

26  right to interest at the Florida judgment rate from February 6, 2010 until paid. Campbell asserts he

27  has other collateral that includes Raffone's membership interest in the Debtor. He claims he filed

28  a UCC-1 in Florida on January 21, 2010, despite that such date is prior to the February 6, 2010

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

1 judgment date.  He also claims liens on Raffone's Florida real estate.  A certified copy of Final

2 Judgment was allegedly recorded in Loxahatchee County in January 2010, which date is prior to

3 the February 6, 2010 judgment date.  Campbell's actual rights are unclear and subject to litigation.

4   Accordingly, if the Plan is confirmed, then upon close of escrow, and transfer of lien to

5 proceeds for payment of the flat settlement amount proposed herein on account of his allowed

6 claim, Campbell will be required to release all of his liens on all the Debtor's collateral.  Under

7 this Plan, Campbell trades the uncertainty of litigation and the opportunity to get cash estimated at

8 $3 million, against the possibility that the case may be converted to chapter 7 or alternatively, the

9 Property cannot be sold for an amount sufficient to pay administrative claims, leaving the estate

10 administratively insolvent and incapable of confirming any plan, and losing the Property to

11 foreclosure by Madison.  Pursuant to the Settlement Agreement, Class 4 claims will be paid a

12 second payment out of excess funds according to their respective percentages as described in the

13 far right column of Exhibit C after the Administrator has paid Classes 1-3 and reserved for or paid

14 all nonclassified or administrative claims, including wages and tenant deposits.

15   Class 4 under this Plan will accrue no interest or other fees or charges of any kind on the

16 $3,000,000 settled claim amount.  Several creditors, particularly those in Classes 5-8, believe that

17 Campbell is an unsecured creditor holding a general unsecured claim and that this Class 4 should

18 be eliminated and paid in conjunction with the Class 11 claims.  The Plan forecloses that

19 possibility by providing for general mutual releases to become effective upon entry of a final

20 confirmation order.

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|--------|-------------|----------------|----------------|-----------|
| 5 | Secured claim of senior secured lender holding voluntary lien | No | Yes  Flat settled amount of claim is paid in full in two payments | • Pymt interval = Two; see means for effectuating the plan at section III(D) hereof. |
|  | • Name= Christiansen & Jacknin |  |  | • Pymt amt/interval = Fixed allowed amount of claim paid via two payments.  First payment  total est. at $69,166.11 with second payment determined via formula described below. |
|  | • Collateral description = Debtor's Property. |  |  | • Balloon pymt = No. |

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| | • Collateral value = $18MM | | | • Begin date = Close of escrow, or as soon thereafter as funds are available. |
| | • Priority of security int. = fifth (recorded 3.16.10) | | | • End date = Close of estate, or as soon thereafter as actual final cash for distribution can be determined. |
| | • Principal owed = $54,281.66 | | | • Interest rate % = none |
| | • Pre-pet. Arrearage amount = $unknown | | | • Total payout = settled amount of claim. |
| | • Post-pet. Arrearage amount = $unknown. | | | • Treatment of Lien = Lien terminated and extinguished upon payment. |
| | • Total claim amount = $76,851.23 as of April 30, 2011 with waiver of all amounts accrued after that date | | | Actual payment will be in accordance with settlement at Exhibit C. |

Class 5 under this Plan will accrue no interest or other fees or charges of any kind on the $76,851.23 settled claim amount and will receive a settlement payment estimated at a 10% discount. Accordingly, upon close of escrow, and transfer of lien to proceeds for payment of the flat amount proposed herein on account of its allowed claim, Christiansen & Jacknin would be required to release all of its liens on all collateral. Pursuant to the Settlement Agreement, Class 5 claims will be paid a second payment out of excess funds according to their respective percentages as described in the far right column of Exhibit C after the Administrator has paid Classes 1-3 and reserved for or paid all nonclassified or administrative claims, including wages and tenant deposits.

Several creditors believe that Class 5 is an unsecured creditor holding a general unsecured claim and that this Class 5 should be eliminated and paid in conjunction with the Class 11 claims. The Plan forecloses that possibility by providing for general mutual releases to become effective upon entry of a final confirmation order.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 6 | Secured claim of senior secured lender holding voluntary lien | No | Yes Flat settled amount of claim is paid in full in two payments | • Pymt interval = Two; see means for effectuating the plan at section III(D) hereof. |
| | • Name= Casey Ciklin Lubitz Martens O'Connell | | | • Pymt amt/interval = Fixed allowed amount of claim paid via two payments. First payment est. at $444,129.39 with second payment determined by formula described below |
| | • Collateral description = Debtor's real property. | | | • Balloon pymt = No. |
| | • Collateral value = $18MM | | | • Begin date = Close of escrow, or as soon thereafter as funds are available. |
| | • Priority of security int. = sixth (recorded 3.18.10) | | | • End date = Close of estate, or as soon thereafter as actual final cash for distribution can be determined. |
| | • Principal owed = $331,668.73 | | | • Interest rate % = none |
| | • Pre-pet. Arrearage amount = unknown | | | • Total payout = settled amount of claim. |
| | • Post-pet. Arrearage amount = unknown. | | | • Treatment of Lien = Lien terminated and extinguished upon payment. |
| | • Total claim amount = $493,477.10 as of April 30, 2011, with waiver of amounts accrued after that date | | | Actual payment will be in accordance with settlement at Exhibit C. |

Class 6 under this Plan will accrue no interest or other fees or charges of any kind on the $493,477.10 settled claim amount and will receive a settlement payment estimated at a 10% discount.  Accordingly, upon close of escrow, and transfer of lien to proceeds for payment of the flat amount proposed herein on account of its allowed claim, Casey Ciklin Lubitz Martens O'Connell would be required to release all of its liens on all collateral. Pursuant to the Settlement Agreement, Class 6 claims will be paid a second payment out of excess funds according to their respective percentages as described in the far right column of Exhibit C after the Administrator has paid Classes 1-3 and reserved for or paid all nonclassified or administrative claims, including wages and tenant deposits.

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

1    Several creditors believe that Class 6 is an unsecured creditor holding a general unsecured

2    claim and that this Class 6 should be eliminated and paid in conjunction with the Class 11 claims.

3    The Plan forecloses that possibility by providing for general mutual releases to become effective

4    upon entry of a final confirmation order.

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 7 | Secured claim of senior secured lender holding voluntary lien | No | Yes Flat settled amount of claim is paid in full in two payments | • Pymt interval = Two; see means for effectuating the plan at section III(D) hereof. |
| | • Name= Beys Stein & Mobargha LLP | | | • Pymt amt/interval = Fixed allowed amount of claim paid via two payments. First payment  est.at $270,000.00 with second payment determined by formula described below |
| | • Collateral description = Debtor's Property. | | | • Balloon pymt = No. |
| | • Collateral value = $18MM | | | • Begin date = Close of escrow, or as soon thereafter as funds are available. |
| | • Priority of security int. = seventh (recorded 5.4.10) | | | • End date = Close of estate, or as soon thereafter as actual final cash for distribution can be determined. |
| | • Principal owed = $230,421.88 | | | • Interest rate % = none |
| | • Pre-pet. Arrearage amount = unknown | | | • Total payout = settled amount of claim. |
| | • Post-pet. Arrearage amount = unknown. | | | • Treatment of Lien = Lien terminated and extinguished upon payment. |
| | • Total claim amount = $300,000.00 as of Petition Date, with waiver of all amounts accrued after that date | | | Actual payment will be in accordance with settlement at Exhibit C. |

23    Class 7 under this Plan will accrue no interest or other fees or charges of any kind on the

24    $300,000.00 settled claim amount and will receive a settlement payment estimated at a 10%

25    discount.  Accordingly, upon close of escrow, and transfer of lien to proceeds for payment of the

26    flat amount proposed herein on account of its allowed claim, Beys Stein & Mobargha LLP would

27    be required to release all of its liens on all collateral.  Pursuant to the Settlement Agreement, Class

28    7 claims will be paid a second payment out of excess funds according to their respective

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  percentages as described in the far right column of Exhibit C after the Administrator has paid

2  Classes 1-3 and reserved for or paid all nonclassified or administrative claims, including wages

3  and tenant deposits.

4      Several creditors believe that Class 7 is an unsecured creditor holding a general unsecured

5  claim and that this Class 7 should be eliminated and paid in conjunction with the Class 11 claims.

6  The Plan forecloses that possibility by providing for general mutual releases to become effective

7  upon entry of a final confirmation order.

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 8 | Litigation claim (preference and fraudulent transfer, both filed and unfiled) | No | Yes Flat settled amount of claim is paid in full in two payments | • Pymt interval = Two; see means for effectuating the plan at section III(D) hereof. |
| | • Name= United States of America (IRS) | | | • Pymt amt/interval = Fixed allowed amount of claim paid via two payments total. First payment est. at $934,335.49 with second payment determined by formula described below |
| | • Collateral description = none | | | • Balloon pymt = No. |
| | • Collateral value = N/A | | | • Begin date = Close of escrow, or as soon thereafter as funds are available. |
| | • Priority of security int. = N/A (asserted administrative claim) | | | • End date = Close of estate, or as soon thereafter as actual final cash for distribution can be determined. |
| | • Principal owed = $3MM | | | • Interest rate % = none |
| | • Pre-pet. Arrearage amount = Unknown. | | | • Total payout = settled amount of claim. |
| | • Post-pet. Arrearage amount = Unknown | | | • Treatment of Lien = N/A |
| | • Total claim amount = as settled | | | Actual payment will be in accordance with settlement at Exhibit C. |

26  Class 8 under this Plan will accrue no interest or other fees or charges of any kind on the

27  agreement to accept a settlement payment estimated at $934,335.49.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

1    In settlement of the United States' adversary complaint (2:11-ap-1759) in the Nevada Star

2    LLC case and a release from any future litigation in the Nevada Star case, the United States shall

3    receive an initial payment of approximately $934,355.49 at the close of escrow.  Pursuant to the

4    Settlement Agreement, Class 8 claims will be paid a second payment out of excess funds

5    according to their respective percentages as described in the far right column of Exhibit C after the

6    Administrator has paid Classes 1-3 and reserved for or paid all non-classified or administrative

7    claims, including wages and tenant deposits. At the time of the filing of this Disclosure Statement

8    and Plan, the United States' settlement agreement is still subject to final approval by the

9    Department of Justice, though no objection is anticipated.

10    Several creditors believe that Class 8 is an administrative creditor of the Raffone estate

11    only and that this Class 8 should be eliminated and paid in conjunction with the Raffone estate.

12    The Plan forecloses the possibility that such litigation would be brought or prosecuted, by

13    providing for general mutual releases to become effective upon entry of a final confirmation order.

14    **2.    <u>Classes of Priority Unsecured Claims.</u>**

15    Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7)

16    are required to be placed in classes.  These types of claims are entitled to priority treatment as

17    follows: the Code requires that each holder of such a claim receive cash on the Effective Date

18    equal to the allowed amount of such claim.  However, a class of unsecured priority claim holders

19    may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the

20    allowed amount of such claims.

21    The Plan Proponent intends to allow the claim of Vjollca Lumaj for her unpaid regularly

22    hourly wages as if timely filed.  David and Vjollca Lumaj are employees at the Property and allege

23    that they were not paid certain wages, salaries and overtime during the years 2005-2010 when the

24    Property was managed by Raffone, notwithstanding that such claims may be late filed.  Madison

25    believes the legitimate past due wage claim of  Vjollca Lumaj is $36,601.36 for basic hourly

26    wages without any overtime or bonus amounts included.  It shall be in the reasonable discretion of

27    the Administrator to determine whether to allow, compromise or contest the amount of any

28    additional filed claims by such employees that exceeds $36,601.36.  Raffone shall be entitled to

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  object to any treatment of such claims (including the $36,601.36) and the Administrator shall give

2  notice to Raffone of his proposed treatment of such creditors' claims, and if disputed, shall seek a

3  ruling on notice and opportunity for hearing before the Court.  Raffone shall bear the burden of

4  proof if she elects to challenge any portion of the $36,601.36.  David and Vjollca Lumaj shall

5  have the burden of proof if they elect to seek an amount higher than $36,601.36, including the

6  amounts listed on **Exhibit B** as disputed and not allowed.  Vjollca Lumaj's claim shall be paid

7  $10,000 as a priority, and the balance of $26,601.36 in the general unsecured claim in Class 11.

8      The Plan Proponent intends to allow the claim of tenants for their security deposits,

9  believed to be held, at least in part, by Raffone, Campbell and/or Bank of America, N.A.  Tenant

10  security deposits are not funds of Campbell, the Debtor or Raffone.  Under applicable New York

11  law, tenant deposits must be held in a bank in New York state, in each tenants' social security

12  number, with annual reporting directly to the tenants, who are entitled to all interest annually

13  above 1% which they can choose to let accrue or request be paid to them directly from the

14  depositing bank.  Raffone has produced documents that indicate that Campbell garnished at least

15  some the funds of the tenants when he sought collection on the February 6, 2010 judgment of the

16  Florida court against Raffone on February 22, 2010, and may have mistakenly believed the funds

17  to have been hers.  Campbell disputes that allegation.  Minuit believes that Raffone that she

18  personally spent some of the tenant deposits prior to the appointment of Minuit.  Raffone disputes

19  that allegation.  The Administrator shall have no authority to investigate the allegations and

20  possible possession of the tenant deposits by Campbell, which is settled by this Plan.  Under the

21  settlement, an amount believed to be sufficient to re-instate the tenant security deposits is to be

22  paid or credited to the buyer.  The Buyer shall handle the tenant deposits in accordance with New

23  York law and the proposed terms of the contract with the Buyer of the Property.  Notwithstanding

24  any settlement or discharge language in this Plan, Raffone shall not be discharged by this Plan

25  from this obligation to repay any tenant deposits taken by her, which issue shall be determined in

26  the Raffone estate.

27      The following chart lists all classes containing Debtor's §507(a)(3), (4), (5), (6), and (7)

28  priority unsecured claims and their treatment under this Plan.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

| CLASS# | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 9 | Priority unsecured claims pursuant to § 507(a)(4)<br>• Total amt of allowed claims = $36,601.36<br><br>The claims in this Class 10 may be higher if the employees at the Property can submit a justifiable basis for additional compensation that was denied to them. | Yes | $10,000.00 to be paid in cash on close of escrow, with remaining $26,601.36 to be paid in accordance with Class 11.  Claim shall be paid without interest. |
| 10 | Priority unsecured claims pursuant to § 507(a)(7)<br>• Total amt of claims = $79,167.05 | Yes | Funded in full in cash on the Effective Date to buyer of Property for the benefit of claim holders. |

The amount of each tenant's security deposit, to be funded under this Plan is set forth with more particularity on Exhibit F.  The total amount to be funded under this Plan is $79,167.05.  If the Plan is confirmed, then each tenant shall receive credit for his or her deposit only the amount set forth on Exhibit F and shall not be entitled to make any further claim against the Debtor, the estate, the Administrator, the post confirmation Debtor, any buyer or any other party or entity for an amount greater than what is specified on Exhibit F.  All tenants' rights under applicable state law, to have interest accrue on each tenant's security deposit or other rights, will commence on the Closing Date of the proposed sale to the buyer.  Nothing in the Plan shall prevent the Buyer from enforcing all rights against a tenant under applicable state law, including set off of such tenant's security deposit.

To the extent that any claim listed on Exhibit B is later determined by the Administrator to be a priority unsecured claim, or if the Court enters an order affording treatment as a priority unsecured claim to the holder of any claim that is not set forth in this section of the Plan, the Administrator shall treat such claim as a priority unsecured claim with priority over payment of any general unsecured claim or equity claim for that debtor.  Under the settlement embodied in this Plan, the priority portion of the claims in Class 9 and all of Class 10 are to be paid in full.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

### 3.  Class of General Unsecured Claims.

General unsecured claims are unsecured claims not entitled to priority under Code Section 507(a).  The following chart identifies this Plan's treatment of the class containing all of Debtor's general unsecured claims.

| Class | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| 11 | General Unsecured Claims asserted against Nevada Star, est. $922,072.63*<br><br>*Note:  Some claims in this Class 11 have been asserted against both Nevada Star and Raffone. Notwithstanding such fact, such creditors are permitted only one recovery on their claim .  Each dollar actually received under this Plan shall reduce the creditor's claim in the Raffone estate by a like amount. | Yes | • Pymt interval = Two; see means for effectuating the plan at section III(D) hereof.<br>• Pymt amt/interval = Fixed allowed amount of claim paid via two payments.  First payment est. to be $626,829,89, with second payment calculated as described below<br>• Begin date = Close of escrow, or as soon thereafter as funds are available.<br>• End date = Close of estate, or as soon thereafter as actual final cash for distribution can be determined.<br>• Interest rate % = none |

Class 11 under this Plan will accrue no interest or other fees or charges of any kind on the allowed claim amounts.

Class 11 will be split into Class 11A and Class 11B.  Every creditor in Class 11 who holds an allowed claim of $11,000 or less is automatically placed in Class 11B.  Any creditor who holds an allowed claim of $11,000 or more may elect to be treated in Class 11B.

Class 11B shall receive a payment of 50% of the allowed amount on the Effective Date. There will be no second payment to holders of claims in Class 11B.

Class 11A claims will be paid pro rata with Classes 4-8, under the settlement at Exhibit C after the Administrator has paid Classes 1-3, Class 11 B and all reserved for or paid all non classified or administrative claims, including the wages and tenant deposits.  Class 11A will share in the upside if sufficient assets result to make a distribution greater than 50%, but will share in the downside if the value of assets provides for a distribution of less than 50%.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

### 4.   Class of Subordinated Claims

The New York State Department of Taxation and Finance may hold penalty claims against the Property relating to unpaid real estate taxes.  All such claims shall be subordinated and treated in Class 12.  Class 12 shall be paid after all classes with a higher priority are paid in full, excepting only Class 11A which shall be fixed at 50% of the allowed amount.

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 12 | Penalty Claims asserted by the State of New York otherwise part of Class 1. | Yes | Pymt interval = Single. Payment amt/interval = If funds remain after payment of all Class 1-11 claims in the amounts allowed, then payment of all remaining amounts. Interest rate:  None. Total estimated payout = $0.00 |

### 5.   Class of Interest Holders.

Interest holders are the parties who hold ownership interest (i.e., equity interest) in the Debtor.  For the Debtor which is a corporation, entities holding preferred or common stock in the Debtor are interest holders.  For the debtor that is an individual, the Raffone estate is the interest holder.  The following chart identifies the Plan's treatment of the class of interest holders:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 13 | Interest holder of the Debtor – deemed to be solely Claudia Raffone  and excluding Henry Douglas Campbell who shall accept his Class 4 treatment if votes in favor of Plan.  With a current bankruptcy case pending for Raffone, the Debtor's membership interest is currently property of the Raffone's estate. | No<br><br>The Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest. | Unimpaired |

### D.   Quarterly Fees

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) prior to the date of confirmation shall be paid to the United States Trustee on or before the Effective Date of the Plan.  Madison's cash collateral that has accrued and is held by Minuit and or the state court receiver, Kahn or his

1  managing agent, New York City Management LLC ("NYC Management"), shall be used for such

2  purposes.

3      Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid by

4  the Administrator to the United States Trustee in accordance with 28 U.S.C. § 1930(a)(6) until

5  entry of a final decree, or entry of an order of dismissal or conversion to chapter 7.  Such

6  payments shall be made from the proceeds of the sale of assets, or from the cash collateral.  If

7  advanced by Madison, then Madison shall be entitled to add such amounts to its Class 2 secured

8  claim.

9      **E.    <u>Mutual General Releases</u>**

10     *Excepting only (i) the litigation between Campbell and Raffone with respect to matters*

11  other than *the sale of the property of the Debtor's estate, (ii) litigation that may be brought by the*

12  *IRS against Raffone, (iii) rights of creditors who hold claims against the Raffone estate, all of*

13  *which are preserved to the extent not paid in full in this Plan, and (iv) the rights of creditors to*

14  *object to administrative fees of the prepetition and post petition estates,* as part of this Plan, all

15  participating parties, including the Debtor's estate, shall release the others and agree to cease all

16  litigation and not to commence new litigation.  Except with respect to the obligations created by or

17  arising out of this Plan, and except as set forth in the first sentence of this paragraph, Debtor, the

18  Debtor's estate and each creditor, for themselves and their legal successors, heirs and assigns do

19  hereby release and absolve and forever discharge each of the others and their respective past,

20  present and future legal successors, heirs, assigns, attorneys, principals, members, shareholders,

21  subsidiaries, parents, affiliates, sureties, insurers, officers, directors, agents, employees and other

22  representatives, of and from any and all claims, demands, damages, debts, liabilities, accounts,

23  obligations, costs, expenses, liens, actions and causes of action of every kind and nature whatever,

24  whether now known or unknown, suspected or unsuspected, which any parties now has, own or

25  hold, or at any time previously had, owned or held, or could, shall or may later have, own, or hold

26  against any other party, based upon, related to or by reason of any matter, cause, fact, act or

27  omission related to or by reason of any contract (express, implied in fact or implied by law), tort,

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  lien, liability, matter, cause, fact, thing, act or omission whatever, occurring or existing at any time

2  up to and including the date of this Plan (all of which are referred to as "Released Matters").

3      Included in the term Released Matters shall be a full release of any lawyer or law firm

4  whose claim is treated in this Plan that was previously employed by the Debtor is released from all

5  future representation of same as if terminated and has no further obligation to the Debtor.

6      Except as specifically carved out above, it is the intention of the parties in jointly

7  formulating and voting for this Plan, and in paying and receiving the consideration called for by

8  this Plan, that this Plan and the general release by the all affected parties shall be effective as a full

9  and final accord and satisfaction and general release of and from any claims, damages, debts,

10  liabilities, accounts, obligations, costs, expenses, liens, accounts, and causes of action of every

11  kind and nature whatever, whether now known or unknown, suspected or unsuspected, specified

12  herein as "Released Matters."

13  **F.    Means of Effectuating the Plan.**

14      **1.    Debtor's Alternative**

15      The Debtor believes that a more appropriate plan of reorganization would be that a more

16  appropriate plan would be to develop the Property into condominiums, provide Raffone with a life

17  estate to the penthouse at no charge and pay her a monthly stipend of $4,000.  Creditors of the

18  Debtor rejected this approach.

19      **2.    Funding for the Plan.**

20      The Plan will be funded by the following:  (1) turnover of cash from Kahn the duly

21  appointed state court receiver, including any tenant deposits he may be holding at the time of

22  confirmation, (2) turnover of tenant deposits in possession of Minuit, Bank of America, N.A.,

23  Campbell and/or Raffone, if any, and (3) sale of the Property.

24      **3.    Requirement of Tax Election**

25      Under this Plan, for taxable year 2011, the Debtor is a disregarded entity and no separate

26  taxable estate is created under 26 U.S.C. § 1399.  The Administrator will file the required

27  information return reporting the taxable income for the owner of the Debtor's interests, the

28  Raffone bankruptcy estate.  The Bankruptcy Court has previously ordered that the owner of all

1   membership interests in the Debtor is the estate of Raffone, and thus the Raffone estate shall be

2   liable for any 2011 post petition administrative taxes.  26 U.S.C. § 1399; In re KRSM Properties,

3   LLC, 318 B.R. 712, 719 (9th Cir. Bankr. 2004) (*citing* 26 C.F.R. § 301.7701-3(a)).

4   **4.    Post Confirmation Authority of Administrator**

5       The Plan provides for the appointment of a post confirmation Administrator, Samuel

6   Biggs.  The Administrator's employment shall be governed by the terms of this Plan.

7       Upon entry of the Confirmation Order, the chapter 11 estate shall be deemed to continue

8   unabated until entry of a final decree.  The post-confirmation estate shall be vested with title to all

9   assets of the estate, whether or not disclosed, including but not limited to, all assets listed on the

10  Debtor's schedules, any and all causes of action belonging to the estate and all cash on hand in the

11  Debtor's accounts, and all other assets that may be located by the Administrator.

12      Post confirmation, the Administrator shall maintain insurance on the Property at all times,

13  listing Madison as mortgagee and loss payee on the property insurance and as mortgagee and

14  additional insured on the liability insurance until paid.

15      Post confirmation, the Administrator shall be the sole owner of the Property in the hands of

16  the Reorganized Debtor.  Raffone shall not be considered the owner of the Property for any

17  purpose, under any applicable non bankruptcy law.  Nothing in this paragraph shall prevent

18  Raffone from retaining her interest as a member of Class 13, however, there can be no distribution

19  of cash to Raffone until ***after*** satisfaction of all claims under this Plan, including, but not limited

20  to, payment in full of Classes 1-12.  At all times prior to the satisfaction of all claims under this

21  Plan, Raffone shall not be the owner of the Property.

22      Immediately upon his appointment, the Administrator shall be required to retain Eastern

23  Consolidated as the estate's broker(s) and proceed to close the Debtor's real property sale pursuant

24  to the proposed Purchase and Sale Contract ("Contract") attached as Exhibit E, as may be

25  amended by the Court.

26  **a.    Sale of Property**

27      Subject to the terms and conditions of the Contract attached hereto at Exhibit E, the

28  Administrator shall on the Closing Date as defined below, sell, transfer, convey, and assign all

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  right title and interest, and deliver good and marketable title, free and clear of any and all liens,

2  claims and encumbrances, including but not limited to any claim by or on behalf of Campbell, the

3  land and the improvements and commonly known as 114 West 86th Street, New York City, New

4  York.

5      The Administrator shall make a good faith effort to locate all pre-petition information,

6  data, reports, schedules, books and records of the Debtor in any format whatsoever, and transfer it

7  to Bernstein Real Estate, a New York corporation ("Buyer") or such other overbidder as the Court

8  may approve ("Qualified Overbidder").  Buyer shall take reasonable steps to protect and keep

9  private the information of the Debtor and or tenants included in the purchased assets. The

10  Administrator shall continue to have access to all books, records and information as is reasonable

11  and necessary, after the Closing.

12      Buyer shall deposit with the Seller's selected escrow agent (i) the earnest money deposit in

13  the sum of One Million Dollars ($1,000,000) to be made by Buyer, together with all accrued

14  interest thereon, and (ii) Buyer's executed counterpart of the Contract to the selected escrow agent

15  no later than two (2) days after the entry of the Sale Order and the Plan Confirmation Order by the

16  Bankruptcy Court.  Buyer shall be required to deposit with Seller written evidence of its ability to

17  fund the purchase of the Property on an all-cash basis, at least two (2) days before the hearing date

18  set to consider the Sale Order and Plan Confirmation Order.

19      The balance of the final approved purchase price shall be paid at the Closing as defined

20  below, by wire transfer or by the delivery to Seller of cash, a Cashier's Check, or other similar

21  cash equivalent.

22      **b.      Overbid Procedures and Break Up Fee**

23      Buyer understands that the Contract is subject to approval by the Bankruptcy Court.  Buyer

24  understands that the Bankruptcy Court may or may not approve the following bidding procedures.

25  Madison agrees that it will use its best efforts to obtain Bankruptcy Court approval of the bidding

26  procedures that will be binding on the estate.  The following bidding procedures are proposed:

27      a)      An unconditional requirement that any competing bidder agree to sign and actually

28  sign the same form of Purchase and Sale Contract as executed by Buyer herein, save and except

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

1  for the identification of the competing bidder and a clear and unconditional statement of the higher

2  and better bid.  Buyer shall be promptly provided with a copy of any higher and better offers

3  received.

4       b)      That (a) a higher and better bid shall be defined as 101% of the Purchase Price (the

5  "Initial Overbid") and all further incremental overbids after the Initial Overbid shall be in the

6  amount of Twenty-Five Thousand Dollars ($25,000), (b) any party placing an overbid shall be

7  unconditionally required to purchase the Property on an all-cash basis within twenty-one (21) days

8  after entry of a Bankruptcy Court order authorizing the sale of the Property on the terms of the

9  Contract (excepting the Purchase Price, which shall be the overbid amount), (c) the deposit must

10 be made in immediately available funds (certified check or funds wired to the account of Seller's

11 selected escrow agent), (d) any party placing an overbid must provide the Bankruptcy Court with

12 written evidence of its ability to fund the purchase of the Property on an all-cash basis and (e) any

13 party placing an overbid must disclose the identity of any real estate broker representing such

14 party who will be entitled to the shared payment of a brokerage commission upon the sale.

15      c)      Buyer shall be obligated to participate in any overbid process by submitting a

16 revised offer in accordance with the overbid requirements in response to any overbids received

17 from third parties, except that if any third party submits an offer equal to or in excess of Eighteen

18 Million Two Hundred Fifty Thousand Dollars ($18,250,000), Buyer shall no longer be obligated

19 (but shall be entitled) to participate in the overbid process.  If the successful Overbidder fails to

20 close the purchase of the Property within the time required in the Contract, and if the Contract is

21 subsequently terminated as a result of such failure, Buyer's latest overbid or the next highest

22 overbid shall be considered the backup overbid and Buyer or the next highest Overbidder shall

23 close the sale in accordance with the terms of this Contract, except that the Purchase Price shall be

24 Buyer's or the next highest Overbidder's last overbid amount and the Closing Date shall be

25 twenty-one (21) days after Buyer or the next highest Overbidder, as the case may be, is notified

26 that the backup overbid has been accepted.  .

27      d)      Seller shall not be permitted to accept or otherwise entertain bids for any portion of

28 the Property, or in lots or parts of the Property.  Seller shall only sell the Property as a whole.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

e)      Any potential bidder who wishes to participate in the bidding process must deliver to Madison at least two (2) days before the hearing date set to consider the Sale Order and Plan Confirmation Order (i) evidence of its financial wherewithal to complete the transaction, including without limitation financial statements, financing commitment letters or other satisfactory evidence which the Administrator determines, in his sole discretion, is necessary to demonstrate the Potential Bidder's ability to perform if its bid is accepted; (ii) a written bid in the form of the proposed Contract at Exhibit E, as provided above, with no contingencies, no additional representations and warranties and no changes in timing.  Madison will circulate the materials received under this subparagraph to (v) Fox Rothschild, (w) counsel David Neale for the junior secured creditors, (x) Committee counsel, (y) Campbell's counsel, and (z) the IRS's counsel, each of who will have an opportunity to review such materials and request orally that the Bankruptcy Court designate those potential bidders that meet the various requirements, in the Court's sole discretion, as "Qualified Bidders."  Any Qualified Bidder must appear at the hearing date set to consider the Sale Order and Plan Confirmation Order.

f)      Furthermore, it is agreed that any competing qualified bidder, as herein provided, must provide to the Administrator, not later than 1:00 P.M. (PST) on the second (2nd) day immediately following the hearing date set to consider the Sale Order and Plan Confirmation Order, or such other time as the Court may set, with a non-refundable good faith deposit in the amount of $1,000,000 U. S. (One Million Dollars U.S.) in order to be eligible to close.

g)      It is expressly agreed that Buyer shall not be excluded at any time from the auction process.

h)      Any objection to the hearing date set to consider the Sale Order and Plan Confirmation Order must be in writing, with an original and one (1) copy filed and served on the interested parties and Buyer as required by applicable Court order.

i)      It is understood and agreed that Madison will seek to retain a broker on shortened time on behalf of the Debtor's estate, who will continue to solicit interest in the Property and provide information to prospective potential bidders who have executed a non disclosure agreement in form and substance satisfactory to Madison.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

j)    Only Buyer and Qualified Bidders shall be entitled to participate in the auction sale.  If Madison does not receive at least one Qualified Bid prior to or at the hearing date set to consider the Sale Order and Plan Confirmation Order and provides Buyer with a copy thereof, then no auction sale shall be conducted and the sale hearing as part of the hearing date set to consider the Sale Order and Plan Confirmation Order shall proceed with the sale to the Buyer as the successful bidder.

k)    Buyer shall be paid a break up fee of Two Hundred Fifty Thousand Dollars U.S. ($250,000 U.S.) from the sale proceeds of the successful bidder if an only if the total bid is $18,250,000 or higher.

l)    Notwithstanding any other provision in the Contract to the contrary, it is expressly understood and agreed that Buyer and Overbidder shall not assume any liability or obligation of Seller.

### c.    Sale Order

A Court Order of the Bankruptcy Court pursuant to Section 363, and, if necessary, Section 365, of the United States Bankruptcy Code as to Buyer, or the qualified and successful bidder ("Sale Order"), is a condition precedent to the Closing.  It hereby agreed that said the Sale Order sought by Madison, even if contained within the provisions of the confirmation of the Plan, shall provide that such sale was:

a)    Properly noticed to creditors and all other parties entitled to notice.

b)    For a fair price for the Property.

c)    Non collusive and conducted between Buyer and Seller at arms length.

d)    Final for all purpose contemplated under Section 363 (m) of the Bankruptcy Code.

e)    Properly consummated as to Bankruptcy Code Section 365 with regard to any assumed obligations (leases or licenses or sublicenses coincident to the Property).

### d.    Closing

The closing terms that shall be applicable to both Buyer and Seller are as follows:

a)    The Closing shall be held on the Closing Date, as defined in the Contract attached at <u>Exhibit E</u>, at the offices of Seller's selected escrow agent, or such other place in the City and

1 State of New York as Seller shall designate to Buyer, provided that there is no stay of any sale

2 order in effect or Notice of Appeal threatened or filed.  Subject to the provisions of the Contract,

3 the closing date is expected to be not later than twenty-one (21) days after the entry by the

4 Bankruptcy Court of the Sale Order and Plan Confirmation Order.

5        b)      The Closing shall take place at a mutually agreeable time.

6        c)      All Closing related proceedings shall occur simultaneously, and no delivery shall

7 be considered to have been made until all aspects of the Closing have been completed.

8        **e.**      **Auction and Other Conditions**

9        Absent the express written consent of Madison, the Administrator shall not be entitled to

10 sell the Debtor's Property if the Supreme Court  for the State of New York, New York County has

11 entered a final judgment of foreclosure and sale in the action known as Index No. 103172/10,

12 *Madison Realty Capital, L.P.. v. Nevada Star, LLC, et al.* ("Foreclosure Litigation").  Madison

13 agrees that it will not seek entry of a final judgment in the Foreclosure Litigation prior to May 31,

14 2011.  The Administrator shall exercise his best efforts to complete a sale of the Debtor's Property

15 at the highest and best price before May 31, 2011, but not later than June 30, 2011.  The sale shall

16 be free and clear of all Raffone's and Campbell's asserted rights as owner and all claims.  Any

17 sale of real property of either estate shall be free of transfer tax in accordance with 11 U.S.C.

18 § 1146(a).

19        At the close of escrow for the Property, the Administrator shall be entitled to set aside

20 funds for the payment of the pre-petition administrative claims and $35,000.00 for his post

21 confirmation administrative claims and expenses, including the Administrator's accountants,

22 attorneys, and other professionals (excepting administrative tax claims and costs to operate the

23 Property prior to Closing) and all other claims in accordance with the terms and intent of the Plan.

24 Any post-confirmation administrative claims and expenses (excepting administrative tax claims)

25 exceeding $35,000.00 shall require consent of the creditors in classes 4, 5, 6, 7, and 8 or approval

26 of the Court.

27        The Administrator shall be entitled to retain an accountant of his choice to file the estate's

28 final tax return.  The Administrator shall exercise best efforts to determine the amount of capital

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1   gains tax that is owed to taxing entities, but shall only be required to pay the sums set forth in this

2   Plan.  The Administrator shall exercise his best efforts to negotiate fair and reasonable

3   employment terms for the proposed accountant and shall present his application to the Court with

4   notice and opportunity to be heard by all creditors.

5       Raffone, Minuit, Kahn, Bank of America, N.A., and the debtors' counsel shall have the

6   duty to turn over all books and records and assets to the Administrator.  Raffone shall have a duty

7   to cooperate with the Administrator whenever asked to do so on reasonable terms, including the

8   obligation to provide confidential, financial and potentially privileged information to allow the

9   Administrator to fulfill his duties under this Plan.  Raffone shall fully and completely respond to

10  all inquiries of the Administrator and his staff and professionals.  Assets shall be turned over to the

11  Administrator subject to secured liens and claims.  The Administrator shall have the authority to

12  seek Court orders to enforce this provision.  The Administrator shall not be entitled to insist upon

13  a waiver of the attorney client privilege of Raffone, but he may obtain information that is

14  otherwise protected by the accounting, tax, financial or other banking privileges that would

15  otherwise protect Raffone's privacy.

16      The Administrator shall have the authority, but not the obligation, to retain other

17  professionals and experts, including attorneys, to assist him in fulfilling his obligations under this

18  Plan, which are to liquidate such assets as are necessary to permit all creditors of each estate to be

19  paid on their allowed claims in full.  Absent express written consent from such secured creditor or

20  as set forth in this Plan, no secured creditor can be compelled to permit its collateral to be used to

21  pay the Administrator or his professionals, any administrative expenses, income taxes upon sale of

22  the Property, or any priority or general unsecured creditors, and in lieu thereof, accept payment

23  from assets that are not part of its security prior to the liquidation of its collateral.

24      The Administrator shall be expressly permitted to retain as his own counsel the attorney

25  who was counsel for the Committee.  The Administrator can elect to retain post confirmation

26  counsel to assist him in fulfilling his obligations as the Administrator under this Plan and the

27  Order confirming this Plan.  All parties waive any right to contest the Administrator's retention of

28  the Committee's former counsel on any grounds, excepting only hourly rate and fees to be

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  charged.  No objections on the grounds of lack of disinterestedness shall be permitted.  Nothing in

2  this paragraph shall be deemed to waive any party's right to be heard at the time of any application

3  for allowance and payment of fees or expenses by any party or entity.

4         The Administrator shall exercise his best efforts to negotiate fair and reasonable

5  employment terms for his choice of counsel and shall present his application to the Court with

6  notice and opportunity to be heard by all creditors.  Once invoices from post petition professionals

7  are received, if the Administrator has either approved the invoice or taken no action within

8  20 days after submission of the invoice, the invoice shall be deemed approved and the

9  Administrator may pay such invoice from the post-confirmation estate.  If an objection is raised to

10  the invoice, which the parties are unable to resolve, the affected professional may submit a fee

11  application to the Court pursuant to the Local Rules, except that no 45 day notice of a fee hearing

12  for all professionals shall be required and notice need only be given electronically to parties

13  registered with the Court's Electronic Case Filing system.

14        The Administrator shall be entitled to locate and take possession, custody and control over

15  any property of the Debtor's estate, including the real property and personal property assets listed

16  on the Debtor's schedules, or any other asset of the Debtor's estate that he may locate.  Raffone

17  shall cooperate in the transfer of physical possession and title to the Administrator as reasonably

18  requested by him.  Raffone shall permit the Administrator to inspect any and all assets or the

19  Debtor in her possession, custody or control.  Raffone shall cooperate with the Administrator and

20  provide him access to books and records as requested, and all information that might lead to the

21  discovery of additional assets.

22        Except as waived in the Plan or previously ordered by the Court, the Administrator shall be

23  entitled to bring on litigation to recover assets from third parties or the Debtor, and subsequently

24  market and liquidate such assets as necessary to fulfill his duties under the Plan.  The

25  Administrator shall not file any avoidance power actions against creditors in Classes 2-7, 8 and 11.

26        In the event that the Administrator can reach an agreeable compromise between the estate

27  and a third party with respect to an asset of the Debtor's estate, the Administrator shall have sole

28  discretion to compromise the estate's claims, rights and obligations with respect to the assets of

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

1    the Debtor's estate upon the giving of a 10 day written notice to other parties or the Court.  So

2    long as his discretion is exercised reasonably, and no objection to the compromise is filed, then the

3    compromise shall take effect without a Court order or hearing.  Any party who contests the

4    reasonableness of the Administrator's decisions shall, before the expiration of the ten days, seek a

5    hearing on proper notice before the Court, in which case the Administrator's compromise shall not

6    be effective until approved by the Court.

7         Under this Plan, Minuit, Kahn, Bank of America, N.A., and Campbell, shall be required by

8    Court order to turn over the security deposits originally held in the name of Raffone (or any other

9    name, including if held in the name of the individual tenants), relating to the real property of the

10    Debtor's estate, to the Administrator for handling and treatment under this Plan, if any are in their

11    possession.  The Administrator shall be authorized to take such action as is necessary to compel

12    any of Minuit, Kahn, Bank of America, N.A., or Campbell to release the tenant security deposits

13    to him.  The Order confirming this Plan shall provide for turnover of the tenant deposits to the

14    Administrator who will tender them to the buyer of the Property, or provide the buyer with an

15    appropriate credit.

16         Under this Plan, Minuit and Kahn shall be required by Court order to turn over all cash or

17    cash collateral relating to the real property of the Debtor's estate to the Administrator for handling

18    and treatment under this Plan.  The Administrator shall be authorized to take such action as is

19    necessary to compel Minuit and Kahn to release all cash to him.  The Order confirming this Plan

20    shall provide for turnover of cash on hand to the Administrator.  Nothing in this paragraph shall

21    prevent the Administrator from determining whether to keep Minuit, Kahn or any other person

22    employed as the on-site manager for the Property prior to sale or abandonment of the Property,

23    and to permitting Minuit, Kahn or such other selected person or entity to hold cash collateral as

24    the agent of the Administrator.

25         The Administrator shall be entitled to employ a manager to operate the Property prior to its

26    liquidation.  The Administrator may elect to continue to use Minuit, Kahn, or may use the services

27    of any other qualified manager.  The decision of who to use to manage the Property shall be within

28    the sole discretion of the Administrator.  The Administrator shall exercise his best efforts to

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  negotiate fair and reasonable employment terms for such manager but shall not be required to

2  present any application to the Court with notice and opportunity to be heard by all creditors, and

3  such manager shall be considered to be employed in the ordinary course of business.

4  **5.    Payment of Creditors**

5  Allowed priority, secured, unsecured and allowed pre-petition administrative claims (to the

6  extent finally allowed and approved for payment) shall be paid in full from the funds held by the

7  Administrator after the escrow for the sale of the Property has closed and the final claim amounts

8  are determined with sufficient precision to permit the payments to be made. Proceeds shall be

9  distributed by the Administrator as soon as practicable to all allowed claims.

10  Under the Plan, as long as the payment of Class 2 is not impaired, funds may be set aside

11  from the sale of the Property for the payment of (i) first pre-petition approved administrative

12  expenses of the Committee counsel and the debtors' counsel on final fee applications, and

13  (ii) second to fund post petition administrative fees, costs and expenses incurred by the

14  Administrator and his professionals in administering the Reorganized Debtor's estate.

15  The Administrator shall give not less than ten (10) calendar days notice of his intent to

16  draw his own post confirmation fees and expenses (whether to him or his professionals) to all

17  parties in interest by first class mail. Any party who objects to the payment of such noticed

18  amounts must provide a written objection, stating the reasons therefore to the Administrator at

19  least two (2) court days prior to the noticed date and request a hearing thereon. Madison and

20  Campbell shall not be permitted to object to payment of any noticed post confirmation fees and

21  expenses.

22  **6.    Use of Cash Collateral**

23  The Administrator shall be permitted to use cash collateral of Madison during the post

24  confirmation pre-closing period so long as such cash is only used in accordance with the

25  categories previously approved by Madison in the cash collateral budgets [Docket Nos. 31, 45 and

26  76], or in accordance with the express terms of this Plan, or with express written consent of

27  Madison. Without leave of Court, and without notice to creditors, Madison and the Administrator

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1 may consent in writing to any additional use of cash collateral that the Administrator feels is in the

2 best interests of all creditors and to assist in the consummation of this Plan.

3              **7.      Post-Confirmation Management.**

4       Post-confirmation management will be vested in the Administrator, who shall be Samuel

5 Biggs, A Professional Corporation, with an office address located at 2800 28th Street, Suite 300,

6 Santa Monica, California, 90405.  A copy of Bigg's CV is attached hereto as Exhibit "1."

7              **8.      Disbursing Agent.**

8       The Administrator shall act as the disbursing agent for the purpose of making all

9 distributions provided for under the Plan.  The Administrator shall serve without bond and shall

10 receive his hourly compensation and reimbursement of actual out of pocket expenses for services

11 rendered and expenses incurred pursuant to the Plan.  Any dispute that arises with respect to the

12 Administrator's fees and expenses shall be determined by the Court, which shall retain jurisdiction

13 to determine such disputes.

14             **9.      Entry of the Confirmation Order**

15       The Debtor, as a debtor in possession, and Committee will terminate upon entry of the

16 confirmation order.

17             **10.      Entry of Final Decree**

18       Upon payment in full of all allowed claims, the Administrator's duties shall conclude and

19 the estates' assets, if any remaining, shall re-vest in the Debtor.  The Administrator shall thereafter

20 file a final report and account and seek entry of a final decree.

21       **G.      Risk Factors.**

22       This proposed Plan has the following risks:  The primary Plan risk is the inability to close a

23 sale for an amount sufficient to pay all creditors as proposed.  However, the Plan takes this into

24 account by providing for a sharing of the additional liabilities as set forth on Exhibit C to this Plan.

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.    OTHER PROVISIONS OF THE PLAN.

### A.    Executory Contracts and Unexpired Leases.

#### 1.    Assumptions.

Exhibit D sets forth the unexpired leases and executory contracts that any buyer may elect to be assumed as obligations of the Reorganized Debtor under this Plan (*see* Exhibit D for more detailed information on unexpired leases to be assumed and executory contracts to be assumed).

At the sole election of the buyer of the Property, on the Effective Date, each of the unexpired leases and executory contracts listed on Exhibit D shall be assumed as obligations of the Reorganized Debtor.  In the event the buyer elects to assume such contracts, the Order of the Court confirming the Plan shall constitute an Order approving the assumption of each lease and contract listed above.  If you are a party to a lease or contract to be assumed and you object to the assumption of your lease or contract, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.  *See* the Disclosure Statement describing this Plan for the specific date.

#### 2.    Rejections.

On the Effective Date, the following executory contracts and unexpired leases will be rejected:  Any lease or contract the buyer does not wish to assume and any lease or right of possession or occupancy given by Raffone with respect to her real or personal property.

The order confirming the Plan shall constitute an order approving the rejection of the lease or contract.  If you are a party to a contract or lease to be rejected and you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.  *See* Disclosure Statement for the specific date.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT IS MAY 31, 2011.

Any claim based on the rejection of an executory contract or unexpired lease will be barred if the proof of claim is not timely filed, unless the Court later orders otherwise.

**B.**    **Changes in Rates Subject to Regulatory Commission Approval.**

This Debtor and Raffone are not subject to governmental regulatory commission approval of its rates.  The Debtor is subject to New York rent control statutes.

**C.**    **Dismissal of Litigation.**

If the Plan is accepted by creditors, confirmed by the Bankruptcy Court and consummated by the Administrator, then each of the Probate Litigation, the Fraudulent Transfer Litigation, the Florida Civil Litigation, the Discharge Litigation, the Tenant Litigation, and the New York Sale Litigation with respect to the Debtor's estate will be resolved by the Plan.  The Administrator shall be entitled, but not required, to file requests with each respective court for dismissal of the Debtor in such litigation ***with prejudice*** upon substantial consummation of the Plan and at or about the time the Administrator seeks the entry of  a final decree from this Court.  This paragraph shall apply to any other litigation discovered by the Administrator that may not be disclosed in this Disclosure Statement, but the significance of which is fully resolved by this Plan.

**D.**    **Retention of Jurisdiction.**

The Court will retain jurisdiction to the extent provided by law or as provided by this Plan.

**E.**    **Tax Consequences of Plan.**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Debtor and Raffone.  The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

The following are the tax consequences which the Plan will have on the Debtor's tax liability:  It is highly likely there will be tax consequences to the Plan.  A capital gains tax owed to the IRS and to the State of New York will be due if the Property is sold for a value greater than the basis applicable to the Debtor at the time it acquired title to the Property.  It is believed that

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  Raffone may have filed a gift tax return on the Property, albeit late, and may or may not have paid

2  any of the gift taxes then due.  Notwithstanding whatever the actual amounts of the tax claim are,

3  the IRS has agreed to accept the amounts set forth in this Plan, subject to final approval by the

4  Department of Justice of the settlement terms, as full satisfaction of its litigation rights, but not of

5  the payments due from Raffone, and her post confirmation estate.  Certain creditors, including the

6  State of New York may or may not agree to accept the treatment set forth in this Plan, and if the

7  sale of the Property becomes unfeasible, the Administrator may not sell the Property and may

8  abandon it, leaving it to the secured creditors to resolve in state court.

9  **V.    CONFIRMATION REQUIREMENTS AND PROCEDURES**

10        PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OR THIS PLAN

11  SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

12  CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following

13  discussion is intended solely for the purpose of alerting readers about basic confirmation issues,

14  which they may wish to consider, as well as certain deadlines for filing claims.  The Proponent

15  CANNOT and DOES NOT represent that the discussion contained below is a complete summary

16  of the law on this topic.

17        Many requirements must be met before the Court can confirm a Plan.  Some of the

18  requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether

19  the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and

20  whether the Plan is feasible.  These requirements are not the only requirements for confirmation.

21        **A.    Discharge**

22        This Plan provides that upon confirmation, the Debtor shall not receive a discharge of

23  liability.

24        **B.    Revesting of Property in the Debtor**

25        Except as provided in Section IV.D., and except as provided elsewhere in the Plan, the

26  confirmation of the Plan vests all of the property of the Debtor's estate in the Reorganized Debtor

27  under the sole control of the Administrator up to such date on which entry of a final judgment in

28  the Foreclosure Litigation occurs, after which the Foreclosure Litigation judgment shall control

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1   over the rights of the Administrator under this Plan.  The Debtor's Property shall either be sold by

2   the Administrator pursuant to this Plan, or shall be adjudicated by the Supreme Court of the State

3   of New York in the Foreclosure Litigation, or sold at a judicial or nonjudicial foreclosure sale by a

4   secured creditor other than Madison if it has not already foreclosed on the Property, whichever

5   occurs first.

6         **C.**      <u>**Modification of Plan**</u>

7         The Proponent of the Plan may modify the Plan at any time before confirmation.

8   However, the Court may require a new disclosure statement and/or revoting on the Plan if

9   proponent modifies the Plan before confirmation.

10         The Proponent of the Plan, the Administrator, the City of New York, any holder of an

11   administrative claim, the United States Trustee, or any creditor may also seek to modify the Plan

12   at any time after confirmation so long as (1) the Plan has not been substantially consummated, and

13   (2) if the Court authorizes the proposed modifications after notice and a hearing.

14         **D.**      <u>**Post-Confirmation Status Report**</u>

15         Within 120 days of the entry of the order confirming the Plan, the Administrator shall file a

16   status report with the Court explaining what progress has been made toward consummation of the

17   confirmed consolidated Plan.  The status report shall be served on the United States Trustee, all

18   secured creditors, the twenty largest unsecured creditors, and those parties who have requested

19   special notice.  Further status reports shall be filed every 120 days and served on the same entities.

20         **E.**      <u>**Quarterly Fees**</u>

21         Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) prior to the date of confirmation

22   shall be paid to the United States Trustee on or before the Effective Date of the Plan.  Madison's

23   cash collateral that has accrued and is held by Minuit and or the state court receiver, Gerald Kahn,

24   of Smith Buss & Jacobs LLP ("Kahn") or his managing agent, New York City Management LLC

25   ("NYC Management"), shall be used for such purposes.

26         Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid by

27   the Administrator to the United States Trustee in accordance with 28 U.S.C. § 1930(a)(6) until

28   entry of a final decree, or entry of an order of dismissal or conversion to chapter 7.  Such

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1    payments shall be made from the proceeds of the sale of assets, or from the cash collateral.  If

2    advanced by Madison, then Madison shall be entitled to add such amounts to its Class 2 secured

3    claim.

4    **F.**    **Post-Confirmation Conversion/Dismissal**

5    This Plan is self executing.  A failure to close a sale to the Buyer or a foreclosure sale shall

6    not be grounds for any creditor or party in interest to bring a motion to convert or dismiss the

7    cases under § 1112(b).  After the Plan is confirmed, all parties shall have their rights as set forth in

8    the Plan, including their rights to seek default remedies.

9    If the Court orders the cases converted to Chapter 7 after the Plan is confirmed, then all

10   property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant

11   to the Plan, will revest in the Chapter 7 estate, and the automatic stay will be reimposed upon the

12   revested property.

13   **G.**    **Revocation of Plan Confirmation Order**

14   The order confirming the Plan may also be revoked under very limited circumstances. The

15   Court may revoke the order if the order of confirmation was procured by fraud and if the party in

16   interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of

17   the order of confirmation.

18   **H.**    **Who May Vote or Object.**

19       **1.**    **Who May Object to Confirmation of the Plan.**

20   Any party in interest may object to the confirmation of the Plan, but as explained below

21   not everyone is entitled to vote to accept or reject the Plan.

22       **2.**    **Who May Vote to Accept/Reject the Plan.**

23   A creditor or interest holder has a right to vote for or against the Plan if that creditor or

24   interest holder has a claim which is both (1) allowed or allowed for voting purposes and

25   (2) classified in an impaired class.

26           **a.**    **What Is an Allowed Claim/Interest.**

27   As noted above, a creditor or interest holder must first have an allowed claim or interest to

28   have the right to vote.  Generally, any proof of claim or interest will be allowed, unless a party in

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

1    interest brings a motion objecting to the claim.  When an objection to a claim or interest is filed,

2    the creditor or interest holder holding the claim or interest cannot vote unless the Court, after

3    notice and hearing, either overrules the objection or allows the claim or interest for voting

4    purposes.

5        THE BAR DATE FOR FILING A PROOF OF CLAIM IN THE DEBTOR'S CASE WAS

6    *AUGUST 20, 2010*.

7        THE PROPONENT HAS ASKED THE COURT TO SET A BAR DATE FOR FILING A

8    PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE

9    OR CONTRACT OF MAY 31, 2011.

10       A creditor or interest holder may have an allowed claim or interest even if a proof of claim

11   or interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's

12   schedules and such claim is not scheduled as disputed, contingent, or unliquidated; (2) no party in

13   interest has objected to the claim; or (3) the Plan proposes to treat the claim as timely.  An interest

14   is deemed allowed if it is scheduled and no party in interest has objected to the interest.

15               **b.    What Is an Impaired Claim/Interest.**

16       As noted above, an allowed claim or interest only has the right to vote if it is in a class that

17   is impaired under the Plan.  A class is impaired if the Plan alters the legal, equitable, or contractual

18   rights of the members of that class. For example, a class comprised of general unsecured claims is

19   impaired if the Plan fails to pay the members of that class 100% of what they are owed.

20       In this case, the Proponent believes that every Class, excepting Class 13, is impaired

21   because no creditor will be paid in full on the Effective Date.  Interest holders in Class 13 is not

22   impaired because (i) Campbell is deemed not to be an interest holder, and (ii) Raffone will receive

23   everything to which she is entitled.  Thus, all creditors are entitled to vote to accept or reject the

24   Plan.  Interest holders will not be permitted to vote.  Nothing prevents an interest holder or

25   creditor in objecting to confirmation of the Plan, even if such party is not permitted to, or fails to

26   vote.  Parties who dispute the Proponent's characterization of their claim or interest as being

27   impaired or unimpaired may file an objection to the Plan contending that the Proponent has

28   incorrectly characterized the class.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION

### 3. Who is Not Entitled to Vote.

The following four types of claims are not entitled to vote: (i) claims that have been disallowed; (ii) claims in unimpaired classes; (iii) claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(8); and (iv) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4. Who Can Vote in More Than One Class.

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 5. Votes Necessary to Confirm the Plan.

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by a cram down on non-accepting classes, as discussed later in Section IV(H)(8).

### 6. Votes Necessary for a Class to Accept the Plan.

A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted, voted in favor of the Plan. A class of interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted, voted to accept the Plan.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

7.    **Treatment of Nonaccepting Classes.**

As noted above, even if all impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code.  The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as a cram down.  The Code allows the Plan to be crammed down on nonaccepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not discriminate unfairly and is fair and equitable toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

8.    **Request for Confirmation Despite Nonacceptance by Impaired Class(es).**

The party proposing this Plan will ask the Court to confirm this Plan by cram down if sufficient votes are not received to confirm the plan under section 1129(a).

I.    **Liquidation Analysis.**

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis.  Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee.  Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

1    For the Court to be able to confirm this Plan, the Court must find that all creditors and

2    interest holders who do not accept the Plan will receive at least as much under the Plan as such

3    holders would receive under a Chapter 7 liquidation.  The Plan Proponent maintains that this

4    requirement is met here for the following reasons:  the Plan proposes an agreed upon settlement

5    between creditors in Classes 2-8 and 11, which allows creditors to avoid a situation where(i)  the

6    property is sold and there are insufficient funds to pay the capital gains tax arising out of the sale,

7    or (ii) litigation continues to the point that Madison's interest and other charges impair the ability

8    of junior secured creditors to be paid in full, making a sale nearly impossible with agreements to

9    short payoffs.  As a result, creditors believe that they will receive at least as much as such creditors

10    would receive under chapter 7.

11    Below is a demonstration, in balance sheet format, that all creditors and interest holders

12    will receive at least as much under the Plan as such creditor or interest holder would receive under

13    a Chapter 7 liquidation.  This information is provided by the Plan Proponent based on the Debtor's

14    schedules, MORs and predictions of value of the Property.  This value used for the Property

15    comes from the stalking horse buyer's offer for the Property on March 30, 2011.

### NEVADA STAR LIQUIDATION ANALYSIS

### Assumes No Preference or Avoidance Actions are Filed

**ASSETS VALUE AT LIQUIDATION VALUES:**

CURRENT ASSETS

| | | |
|---|---|---|
| a. | Cash on hand (general, tax and payroll escrow accounts) | $275,000.00 |
| b. | Accounts receivable | $96,239.86[7] |
| c. | Retainer from Law Offices of Michael Berger | $0.00 |
| | TOTAL CURRENT ASSETS | $371,239.86 |

FIXED ASSETS

| | | |
|---|---|---|
| a. | Office furniture & equipment (Computer and equip. at Property) | $1,500.00 |
| b. | Machinery & equipment (Tools and supplies at Property) | $800.00 |
| c. | Automobiles | $0.00 |
| d. | Property in New York | $18,250,000.00 |
| | TOTAL FIXED ASSETS | $18,252,300.00 |

---

[7]    Unpaid rent of $88,522.50 for Unit 11B, and withheld deposits for illegal rent stabilized tenant of $7,717.36 for Unit 7B.  These numbers will likely be higher at the time of confirmation.

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

| | | |
|---|---|---|
| **TOTAL ASSETS AT LIQUIDATION VALUE** | | **$18,623,539.86** |
| | | =========== |
| **Less:** | | |
| Secured creditor's recovery | | |
| a) New York City Department of Finance (as of Nov 8, 2010) | | $1,029,437.00 |
| b) Madison Realty Capital, L.P. (estimate 3.31.11) | | $10,750,000.00 |
| c) Ponichtera Contracting | | $32,017.29 |
| d) Henry Douglas Campbell | | $3,817,386.00 |
| e) Christiansen & Jacknin | | $76,851.23 |
| f) Casey Ciklin Lubitz Martens O'Connell | | $493,477.10 |
| g) Beys Stein & Mobargha LLP | | $300,000.00 |
| **Less:** | | |
| Plan Administrator's carve out for fees and expenses | | $35,000 |
| **Less:** | | |
| Chapter 11 administrative expenses | | $130,650 |
| **Less:** | | |
| Priority claims (Class 9) | | $36,601.36 |
| Priority claims (Class 10) | | $79,167.05 |
| **Less:** | | |
| Debtor's claimed exemptions | | $0.00 |
| **Less:** | | |
| Costs of Sale for Property(est. at 8%) | | $396,950.00 |
| | | =========== |
| Total Chapter 11 Claims (before payment of tax admin and unsecured claims) | | $17,176,587.03 |
| (1) Balance of funds available in Nevada Star | | $1,446,002.83 |
| (2) Carve out for payment of capital gains (disputed) | | $5,200,000.00 |
| **Payment to unsecured creditors in chapter 11:** | | **$0.00** |
| **Payment to unsecured creditors in chapter 7:** | | $0.00 |

(Assumes no reduction in rights of administrative tax creditors, prepetition administrative creditors and secured lien creditors, also presumes addition of chapter 7 trustee fees in excess of $35,000)

**% OF THEIR CLAIMS WHICH NEVADA STAR'S UNSECURED CREDITORS WOULD RECEIVE OR RETAIN IN A CH. 7 LIQUIDATION: = 0%**

**% OF THEIR CLAIMS WHICH NEVADA STAR'S UNSECURED CREDITORS WOULD RECEIVE OR RETAIN UNDER THIS PLAN: = 75-90%**

Under the proposed Plan there is availability of a significant amount of cash to pay unsecured creditors.  Under the Plan, the IRS has agreed to a settlement of its litigation rights which will provide some benefit to unsecured creditors.

### 1.  Benefits of Chapter 11 Plan

Under the Plan, creditors of the Debtor other than just secured creditors will be paid, including past due pre- and post- petition real estate taxes to New York, all secured creditors, all

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1   pre-petition administrative creditors of the bankruptcy case, all post petition expenses of the

2   reorganized debtor, and all capital gains taxes on the sale of the Property, which the IRS has

3   agreed to accept its treatment under the Plan as full payment.  Thus the benefits to the Plan are real

4   and not illusory, including to the Debtor's sole member, and the creditors of the Raffone estate.

5   The alternative of foreclosure by the Plan Proponent or conversion to Chapter 7 and the inherent

6   risks that the appointed trustee might abandon the Property back to the Debtor, continuing the

7   decade long war between Raffone and Campbell, is less appealing.

8        Madison estimates that the distribution in a Chapter 7 case would be zero because the

9   trustee would evaluate the likelihood of a significant administrative tax liability, and determine

10  that the sale of the Property in a chapter 7 sale under 11 U.S.C. § 363 sale would not render any

11  benefit to unsecured creditors.  In a chapter 7 sale, the transfer taxes would not be avoided, and

12  that would impose an additional $500,000 burden on the chapter 7 estate, rendering the Property

13  worth less than the value of secured claims, unless the chapter 7 trustee pursued litigation to

14  render those claims unsecured.  Accordingly, such a trustee, without a compromise offered by the

15  IRS and the secured creditors in this Chapter 11 Plan, would likely abandon the Property to the

16  secured lenders and allow any party's foreclosure to take place.

17      **J.**     **<u>Feasibility.</u>**

18       Another requirement for confirmation involves the feasibility of the Plan, which means

19  that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further

20  financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such

21  liquidation or reorganization is proposed in the Plan.

22       There are at least two important aspects of a feasibility analysis.  The first aspect considers

23  whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the

24  claims and expenses which are entitled to be paid on such date.  The Plan Proponent maintains

25  that this aspect of feasibility is satisfied as illustrated here:

26  Cash on hand by Effective Date:                                          $275,000.00

27  **To Pay:**  Administrative claims (UST, Clerk, and allowed fees)         $130,650.00

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1    **To Pay:**  Statutory costs & charges                                                 -$0.00

2    **To Pay:**        Other Plan Payments due                                       -$0.00
                        on Effective Date (priority and unsecured creditors)

3    Balance (due) after paying these amounts..............................................  $144,350.00

4    The sources of the cash Debtor will have on hand by the Effective Date, as shown above are cash

5    in New York escrow account of Receiver Kahn.

6         The second aspect considers whether the Proponent will have enough cash over the life of

7    the Plan to make the required Plan payments.  The Plan is consummated in the weeks following

8    the Effective Date, but in light of the projected value of the Property, and the purpose of the Plan

9    to liquidate all assets, prospective payments are not believed to be material to performance under

10   the Plan.

11        YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL

12   ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL

13   STATEMENTS.

14        **K.**    **Final Decree.**

15        Once the estates have been fully administered as referred to in Bankruptcy Rule 3022, the

16   Administrator or other party as the Court shall designate in the Plan Confirmation Order, shall file

17   a motion with the Court to obtain a final decree to close the case.

18                                        */s/ Brian Shatz*
                                        Signature of Plan Proponent
19                                       Managing member of Madison Realty Capital GP,
                                        LLC, the general partner of Madison Realty Capital,
20                                       L.P.

21

22                                       */s/ Katherine M. Windler*
                                        Signature of Attorney for Plan Proponent
23                                       Katherine M. Windler of Bryan Cave LLP

24

25

26

27

28

# EXHIBIT 1



## Attending to the needs of our clients

Biggs & Co. is a medium-size firm of certified public accountants serving clients throughout the greater Los Angeles metropolitan area, Northern and Southern California, and other locations nationally. Partner and staff backgrounds include public accounting with Big Six firms, litigation support, and financial management in private industry. Biggs & Co.'s staff has worked with major national and multi-national companies, as well as regional and local businesses. The firm was formed in 1983, and has four partners, as well as supporting staff of managers, accountants and administrative personnel.

Biggs & Co. is one of the leading Southern California accounting firms providing specialized services in the areas of bankruptcy and litigation support, forensic accounting and receivership administration. The firm has handled hundreds of insolvency and receivership cases, and is regularly retained by trustees, financial institutions, law firms, and other parties in litigation, reorganization, investigations, and forensic accounting matters. The firm has also acted as examiner and expert witness in many cases, and is often called upon to provide court testimony relevant to reorganizations, evaluations, fraudulent transfers, and other matters. ■



BIGGS & CO. *Certified Public Accountants*
*Santa Monica, California 90405-2934*
*Tel: (310) 450-0875   Fax: (310) 450-9157*

Exhibit 1 - Page 74

PROFILE

# Samuel R. Biggs

*Managing Partner*

Mr. Biggs began his career in public accounting with Arthur Andersen & Co., subsequently spent several years in executive positions in private industry, and eventually returned to public accounting in 1983 when he founded Biggs & Co.

Mr. Biggs' private industry experience includes financial management with Rockwell International, where he was responsible for financial planning, cost systems, and special projects for a worldwide group of Rockwell companies. He also handled the accounting and financial management of a $100-million leveraged buyout of Rockwell divisions. Subsequent to Rockwell, Mr. Biggs served as Vice President and Director of a data-processing management and consulting firm, dealing with major companies both domestically and internationally.

Mr. Biggs' experience in matters of corporate reorganization, insolvency, and litigation support is extensive. He has worked with numerous troubled companies in financial reorganization, creditor workouts and insolvency, and has actually managed and operated several businesses through their reorganization process. Mr. Biggs is a bankruptcy trustee for the Central District of Southern California and a receiver for the Superior Court of California. He has administered thousands of cases, in several instances actually operating the troubled businesses and real estate ventures–many of which were multi-million dollar entities.



Mr. Biggs graduated from Creighton University in 1965 and received an MBA degree from the University of Wisconsin. He holds a certificate as a certified public accountant and is licensed to practice in the state of California.

He founded the firm of Biggs & Co. with the initial practice concentrated in commercial and business services. The firm's practice has since expanded to include credit union services, forensic accounting, insolvency, and litigation support, and is noted as one of the leading firms in Southern California providing services in these areas. ∎



BIGGS & CO. *Certified Public Accountants*
*Santa Monica, California 90405-2934*
*Tel: (310) 450-0875   Fax: (310) 450-9157*

Exhibit 1 - Page 75

**BIGGS** *Authorized* **SERVICES**

# Selected Receiverships *Administered*

## *Commercial Properties*

| Property Address | Units | Financial Institution |
|---|---|---|
| Fairview Commerce Center | 14,000 sq. ft. | Community Bank |
| Fairview Commerce Center | 17,000 sq. ft. | Community Bank |
| 21103-21161 Victory Blvd., Canoga Park | 24 Units | California Federal |
| 7426 Remmet Avenue, Canoga Park | 20 Units | California Federal |
| 13911-13987 Carroll Way | 10 Units | F.D.I.C |
| 22841-22849 Lockness, Torrance | 2 Units | California Federal |
| 740-790 E. Green Street, Pasadena | Multi-Unit | Glendale Federal |
| 1140 S. Crenshaw Blvd., Los Angeles | 8 Units | First Federal Bank |
| 2082 Michelson Drive, Irvine | 12 Units | Bank of America National Trust |
| 11381-11383 Playa Street | Multi-Unit | L.V. Hilton |
| 11444 Washington Blvd., Culver City | 4 Units | California Federal |
| 221 East Gardena | 1 Tenant | California Federal |
| 22841, 22849 Lockness, Torrance | Multi-Unit | California Federal |
| 308 Riverside Avenue | 19 Units | California Federal |
| 15827 E. Russel St., Whittier | Multi-Unit | California Federal |
| 3500 Wilshire Blvd. | 2 Units | |
| 14117-25 Oxnard | 1 Tenant | Bay Area Financial Corp. |
| 6014 S. Eastern Avenue | Multi-Unit | Kroeger Company |
| 8740 Topanga Canyon | Multi-Unit | California Federal |
| 1140 S. Crenshaw, Los Angeles | Multi-Unit | First Federal Bank |
| 1101 S. Vermont, Los Angeles | Multi-Unit | California Federal |
| 1725 Montana Street, Santa Monica | Strip Mall | Individual Creditor |
| 13105 Lakeland Road, Santa Fe Springs | 2 Units (Industrial) | California Federal |
| 13639-13707 Bora Drive, SFS | 6 Units (Industrial) | California Federal |
| 31416 West Agoura Road, Agoura Hills | 13 Units (Office Bldg) | California Federal |
| 4383 Colfax Avenue, Studio City | Multi (Office Bldg) | First Federal Bank |
| 23325 Hawthorn Blvd., Torrance | Retail Store | East-West Federal |
| 5810 W. Olympic Blvd., Los Angeles | Multi-Unit Retail | The Signature Group |
| 100-150 N. Grand Avenue, W. Covina | 34 Unit (Shopping Ctr) | |
| Olympic Collection Banquet Center | Multi-Unit | The Signature Group |
| Lutzoff Automotive Warehouse | Multi-Unit | First Interstate Bank |
| 2128 Rosemead Blvd., S. El Monte | 1 Unit | Int'l Bank of California |
| Beverly House Hotel, Beverly Hills | 50 Room Hotel | First Federal Bank |
| Downtown Lofts | Ground Fl Retail Space | Citibank |
| MIDA Industries | Operating Business | F.D.I.C. |



BIGGS & CO. *Certified Public Accountants*

*Santa Monica, California 90405-2934*

*Tel: (310) 450-0875   Fax: (310) 450-9157*

Exhibit 1 - Page 76

AUTHORIZED SERVICES

# Selected Receiverships *Administered*

## *Residential Properties*

| Property Address | Units | Financial Institution |
|---|---|---|
| Downtown Lofts | 35 Units | Citibank |
| 10781-10952 Palma Vista, Garden Grove | 32 Units | California Federal |
| 11303 Miranda Street, North Hollywood | 5 Units | First Federal Bank |
| 1149 E. First Street, Long Beach | 20 Units | California Federal |
| 11708 York Avenue, Hawthorne | 8 Units | First Federal Bank |
| 1243-1245 1/2 Maryland St., Glendale | 8 Units | Individual Creditor |
| 12615 Oxford Street, Los Angeles | 8 Units | Coast Federal Bank |
| 12840 Moorpark Street, Studio City | 36 Units | California Federal |
| 1413-1415 Ross Street, Santa Ana | 5 Units | First Federal Bank |
| 1425 Parten Road, Malibu | 1 Unit | KRM Financial |
| 14620 Erwin Street, Van Nuys | 9 Units | Coast Federal Bank |
| 15051 Moorpark Street, Sherman Oaks | 40 Units | California Federal |
| 1710 Gladys Street, Long Beach | 8 Units | Coast Federal Bank |
| 1960 S. Robertson Blvd., Los Angeles | 9 Units | Individual Creditor |
| 21523 Saticoy Street, Canoga Park | 20 Units | California Federal |
| 245 S. Yale Street, Hemet | 20 Units | First Federal Bank |
| 2889-2893 W. 7th Street, Los Angeles | 6 Units | First Federal Bank |
| 419-423 S. Melrose Street, Anaheim | 8 Units | California Federal |
| 430 E. 41st Street, Los Angeles | 4 Units | First Federal Bank |
| 515-519 Fir Avenue, Los Angeles | 16 Units | F.D.I.C. |
| 5507 Moorpark Street, Encino | 20 Units | California Federal |
| 618-626 Detroit Street, Los Angeles | 40 Units | California Federal |
| 7319 Variel Street, North Hollywood | 9 Units | Coast Federal Bank |
| 849 S. Normandie Avenue, Los Angeles | 48 Units | F.D.I.C. |
| 11852 Courtleigh Drive, Mar Vista | 12 Units | First Federal Bank |
| 1227 North Harper | 22 Units | California Federal |
| 1231 Plymouth Street, Los Angeles | 8 Units | First Federal Bank |
| 1233 North Harper | 29 Units | California Federal |
| 1350 North Hayworth | 16 Units | California Federal |
| 1401 N. Ross Street, Santa Ana | 36 Units | First Federal Bank |
| 1436 S. Hauser Blvd., Los Angeles | 7 Units | First Federal Bank |



BIGGS & CO. *Certified Public Accountants*
*Santa Monica, California 90405-2934*
*Tel: (310) 450-0875   Fax: (310) 450-9157*

Exhibit 1 - Page 77

Selected Financial Services SERVICES

# Selected Receiverships *Administered*

## *Residential Properties*

| Property Address | Units | Financial Institution |
|---|---|---|
| 2290 Locust Avenue, Long Beach | 8 Units | First Federal Bank |
| 233 N. Kenmore Street, Los Angeles | 30 Units | F.D.I.C. |
| 4617-4619 1/2 Eagle Rock | 7 Units | First Federal Bank |
| 5843 Willoughby Ave., Los Angeles | 8 Units | First Federal Bank |
| 6503-6525 Miramonte Boulevard | 12 Units | First Federal Bank |
| 6751-6753 86th Place, Westchester | 2 Units | Westside Bank |
| 686 West 17th Steet | 10 Units | California Federal |
| 720 S. Crenshaw Blvd., Los Angeles | 20 Units | First Federal Bank |
| 7209 Willoughby Street, Los Angeles | 15 Units | California Federal |
| 7224 Hillside | 39 Units | California Federal |
| 7307 Willoughby | 7 Units | California Federal |
| 7325 Vineland Avenue, Sun Valley | 12 Units | Bankruptcy-(Kumar, Debtor) |
| 795 Bellflower Boulevard | 36 Units | California Federal |
| 814-816 Verdugo | 30 Units | California Federal |
| 849 S. Oxford Street, Los Angeles | 40 Units | F.D.I.C. |
| 901 S. Irolo Street, Los Angeles | 32 Units | F.D.I.C. |
| 920 North Orange Grove | 27 Units | California Federal |
| Beck Trust | N/A | Individual Creditor |
| 10961-10967 S. Figueroa St., Los Angeles | 18 Units | Trust Savings Bank |
| 12310-12330 Gale Avenue, Hawthorne | 14 Units | First Federal Bank |
| 132 & 134 E. Hazel Street, Inglewood | 20 Units | First Interstate |
| 132 N. Kingsley Drive, Los Angeles | 7 Units | First Federal Bank |
| 1415 Venice Boulevard, Santa Monica | 25 Units | California Federal |
| 1605 E. Second Street, Long Beach | 12 Units | California Federal |
| 17061-17091 Altadena Drive, Tustin | 16 Units | First Federal Bank |
| 1717-1719 W. 48th Street, Los Angeles | 8 Units | First Federal Bank |
| 1723 S. Oxford Street, Los Angeles | 7 Units | First Federal Bank |
| 1835 N. Wilcox Avenue, Los Angeles | 24 Units | F.D.I.C. |
| 1880 Locust Avenue, Long Beach | 12 Units | California Federal |
| 350 S. San Fernando Blvd., Burbank | 400 Units | Coast Federal Bank |
| 3546 Hughes Avenue, Los Angeles | 11 Units | California Federal |
| 3549 Hughes Avenue, Los Angeles | 12 Units | California Federal |
| 400 Elk Lane, Santa Ana | 52 Units | First Federal Bank |
| 4141-4143 Century Blvd., Los Angeles | 9 Units | First Federal Bank |
| 510 E. Chestnut Street, Santa Ana | 52 Units | First Federal Bank |



BIGGS & CO. *Certified Public Accountants*
*Santa Monica, California 90405-2934*
*Tel: (310) 450-0875    Fax: (310) 450-9157*

Exhibit 1 - Page 78

SERVICES

# Selected Receiverships *Administered*

## *Residential Properties*

| Property Address | Units | Financial Institution |
|---|---|---|
| 512 Parkview Place, Los Angeles | 40 Units | F.D.I.C. |
| 5722 Lexington Avenue, Los Angeles | 8 Units | First Federal Bank |
| 5808-5816 Pacific Coast Highway | 28 Units | California Federal |
| 8063 Redlands Street, Playa del Rey | 19 Units | California Federal |
| 832 S. Oxford Street, Los Angeles | 48 Units | F.D.I.C. |
| 841 Gardena Avenue, Long Beach | 16 Units | California Federal |
| 947 S. Normandie Avenue, Los Angeles | 5 Units | Individual Creditor |
| 5200 Hollywood Blvd., Hollywood | 20 Units | Trust Savings Bank |
| 689 Temple Street, Los Angeles | 25 Units | California Federal |
| 729-739 Detroit Street, Los Angeles | 16 Units | California Federal |
| 820 Pier Avenue, Santa Monica | 7 Units | First Federal Bank |
| 904-908 North First Street, Alhambra | 8 Units | California Federal |
| 1030 East First Street, Long Beach | 8 Units | California Federal |
| 1230 East First Street, Long Beach | 10 Units | California Federal |
| 1932-2006 Second Avenue, Los Angeles | 9 Units | First Federal Bank |
| 1212 Amalia, Los Angeles | 10 Units | First Federal Bank |
| 5301 Boswell. Los Angeles | 13 Units | First Federal Bank |
| 5312 Arbor Vitae Street, Los Angeles | 8 Units | California Federal |
| 3107 Bagley Street, Los Angeles | 13 Units | California Federal |
| 21819 Belshire Avenue, Hawian Gardens | 9 Units | California Federal |
| 3724 Bentley Avenue, Los Angeles | | California Federal |
| 1210 North Berendo Street, Los Angeles | 28 Units | First Federal Bank |
| 16001 S. Denker Avenue, Gardena | 13 Units | California Federal |
| 390 N. Garfield Avenue, Pasadena | 13 Units | California Federal |
| 724-726, 730 A&B Gaviota, Long Beach | 6 Units | California Federal |
| 2859 Leeward Avenue, Los Angeles | 12 Units | First Federal Bank |
| 47 Lime Avenue, Long Beach | 12 Units | California Federal |
| 5221 Monte Vista Street | 8 Units | First Federal Bank |
| 940 Olive Avenue, Burbank | | California Federal |
| 1032 Olive Avenue, Burbank | | California Federal |
| 10021 Pinewood Avenue | 7 Units | Individual |
| 1243-1245 1/2 S. Maryland | 8 Units | Residence |
| 15507 Moorpark Avenue, Encino | 20 Units | Residence |
| 1661 Apian Way, Santa Monica | 8 Units | (Bankruptcy) |
| 16820-24 Yukon Avenue, Torrance | 24 Units | Residence |



BIGGS & CO. *Certified Public Accountants*

*Santa Monica, California 90405-2934*

*Tel:* (310) 450-0875   *Fax:* (310) 450-9157

Exhibit 1 - Page 79

**Specialized SERVICES**

# Selected Receiverships *Administered*

### *Residential Properties*

| Property Address | Units | Financial Institution |
|---|---|---|
| 1741 Stanton Place, Long Beach | 12 Units | California Federal |
| 2264 San Anseline Avenue, Long Beach | 6 Units | California Federal |
| 2342 Cedar, Long Beach | 8 Units | California Federal |
| 3559 E. 57th Street, Maywood | 10 Units | California Federal |
| 430 East 41st Street, Los Angeles | 4 Units | First Federal Bank |
| 4389 York Avenue, Los Angeles | 16 Units | Sanwa Bank |
| 504 S. Rampart Street, Los Angeles | 20 Units | First Federal Bank |
| 512 Concord Street, Glendale | 8 Units | Individual |
| 575-577 Walnut Avenue, Long Beach | 23 Units | California Federal |
| 6423-6505 1/2 Miramonte Blvd. | 12 Units | Reliable Mortgage Company |
| 656 W. 17th Street, San Pedro | 10 Units | California Federal |
| 6923-6927 Hayvenhurst Avenue | 8 Units | Reliable Mortgage Company |
| 7230 Independence Avenue, Conoga Park | 14 Units | California Federal |
| 744 Rose Avenue | 9 Units | California Federal |
| 7773 St. Bernard, P.D.R. | 9 Units | California Federal |
| 920 Orange Grove, Los Angeles | 27 Units | California Federal |
| 1032 Olive | 8 Units | California Federal |
| 940 Olive Avenue | 8 Units | California Federal |
| 1031 East 1st Street | 8 Units | California Federal |
| 849 S. Normandie, Los Angeles | 5 Units | |
| 546 Chestnut Avenue | 13 Units | California Federal |
| 9221 Whitworth Drive, Beverly Hills | 7 Units | California Federal |
| 1062 Coronado Ave., Long Beach | 6 Units | California Federal |
| 4208 Clayton | 6 Units | California Federal |
| 131 S. Jackson, Glendale | 24 Units | California Federal |
| 651 W. California Avenue, Glendale | 10 Units | |
| 1483-87 Sherman Way, N. Hollywood | 12 Units | California Federal |
| 1943 Corning, Los Angeles | 5 Units | Fidelity Federal |
| 1522-243/4 Winona Blvd., Los Angeles | 7 Units | Fidelity Federal |
| 12616 Kornblum, Hawthorne | 5 Units | California Federal |
| 506-514 N. Normandie, Los Angeles | 16 Units | Fidelity Federal |
| 13111 Van Owen, N. Hollywood | 16 Units | Fidelity Federal |
| 1145 N. Ogden Dr., W. Hollywood | 22 Units | California Federal |
| 10523 Floralita Ave., Sunland | 39 Units | California Federal |
| 818 S. Mariposa Ave., Los Angeles | 33 Units | California Federal |



BIGGS & CO.  *Certified Public Accountants*
*Santa Monica, California 90405-2934*
*Tel: (310) 450-0875   Fax: (310) 450-9157*

Exhibit 1 - Page 80

# Selected Receiverships *Administered*

## *Residential Properties*

| Property Address | Units | Financial Institution |
|---|---|---|
| 15909 Vanowen Street, Van Nuys | 21 Units | California Federal |
| 8405 N. Orion, N. Hills | 27 Units | Fidelity Federal |
| 12615 Oxford St., Hawthorne | 8 Units | Coast Federal |
| 5227 Monte Vista St., Los Angeles | 8 Units | First Federal Bank |
| 7224 Hillside, Los Angeles | 39 Units | California Federal |
| 16820-16824 Yukon, Torrance | 24 Units | California Federal |
| 1227-1233 Harper, Los Angeles | 20/21 Units | California Federal |
| 7209 Willoughby, W. Hollywood | 15 Units | California Federal |
| 390 Garfield, Pasadena | 13 Units | California Federal |
| 1231 S. Plymouth, Los Angeles | 8 Units | First Federal Bank |
| 4617-46191/2 Eagle Rock, Los Angeles | 7 Units | First Federal Bank |
| 11303 Miranda | 5 Units | California Federal |
| 510 Chestnut Street | 46 Units | Private Party |
| 7246 Remnet, Canoga Park | 20 Units | California Federal |
| 1149 E. 1st St., Long Beach | 12 Units | California Federal |
| 795 Bellflower, Long Beach | 36 Units | California Federal |
| 849 S. Oxford, Los Angeles | 40 Units | 1st Pacific Bank of Beverly Hills |
| 5842 Ludell St. | | California Federal |
| 401 & 503 Pacific & Vine, Long Beach | 9 Units | |
| 1710 Gladys, Los Angeles | 7 Units | Coast Federal |
| 1243 Maryland, Glendale | 8 Units | Adalberto Ferrer |
| 1413-15 Ross Street, Santa Ana | 5 Units | First Federal Bank |
| 6939 Alabama Ave., Canoga Park | 32 Units | |
| Warner Square 211, Canoga Park | 24 Units | California Federal |
| 22841 1-49 Lockness, Torrance | 2 Units | California Federal |
| 5312 Arbor Vitae, Los Angeles | 8 Units | California Federal |
| 724-726 Gaviota, Long Beach | 6 Units | California Federal |
| 504 Rampart, Los Angeles | 20 Units | First Federal Bank |
| 7307 Willoughby, Los Angeles | 7 Units | California Federal |
| 1230 East 1st, Long Beach | 10 Units | California Federal |
| 1210 N. Berendo, Los Angeles | 28 Units | First Federal Bank |
| 3107 Bagley, Los Angeles | 13 Units | California Federal |
| 814 & 816 Verdugo, Glendale | 30 Units | California Federal |
| 711 N. Wilcox Avenue, Los Angeles | 29 Units | California Federal |
| 2109-2111 El Paseo, Alhambra | 3 Units | Federal Home Loan Mortgage |
| 15 W. Mountain View, Long Beach | 15 Units | California Federal |



BIGGS & CO. *Certified Public Accountants*
*Santa Monica, California 90405-2934*
*Tel: (310) 450-0875   Fax: (310) 450-9157*

Exhibit 1 - Page 81

**S p e c i a l i z e d   S E R V I C E S**

# Selected Receiverships *Administered*

## *Residential Properties*

| Property Address | Units | Financial Institution |
|---|---|---|
| 4822-4823 118th Street | 7 Units | California Federal |
| 6622-66241/2 Hollywood, Hollywood | 3 Units | Ullman |
| 47 Lime Ave., Long Beach | 12 Units | California Federal |
| 1725 Sherman Place, Long Beach | 12 Units | California Federal |
| 218 Grand Avenue, Long Beach | 9 Units | California Federal |
| 849 Normandie Avenue, Los Angeles | 48 Units | California Federal |
| 13760 Oxnard St., Van Nuys | 27 Units | California Federal |
| 5965 Washington | 1 Tenant | California Federal |
| 1159 West Boulevard, Los Angeles | 4 Units | Secured Bankers Mortgage Co. |
| 10640 Burbank, Los Angeles | | Wells Fargo |
| 14310 Yukon, Hawthorne | 36 Units | California Federal |
| 13611 Doty, Hawthorne | 74 Units | California Federal |
| 945 N. Hudson Ave., Los Angeles | 8 Units | California Federal |
| 1550, 1552, 1554 N. Lake, Pasadena | 3 Units | Federal Home Loan Mortgage |
| 7655 Lankershim Blvd., N. Hollywood | 36 Units | California Federal |
| 12745 Barbara Anne St., N. Hollywood | 4 Units | Federal Home Loan Mortgage |
| 1201 N. Mansfield, Los Angeles | 18 Units | California Federal |
| 13911-13957 Carroll Way | 12 Units | |
| 11708 York Street, Hawthorne | 8 Units | First Federal Bank |
| 16001 Renker, Gardena | 13 Units | California Federal |
| 2859 Leeinard Ave., Los Angeles | 12 Units | |
| 575 Walnut | 23 Units | California Federal |
| 1436 Hauser Blvd. | 7 Units | First Federal Bank |
| 512 N. Concord, Glendale | 8 Units | California Federal |
| 21523 Saticoy, Van Nuys | | California Federal |
| 1921 Workman Street, Los Angeles | 5 Units | Berro Family Partnership |
| 2272 Duane Street, Los Angeles | 5 Units | Citibank |
| 2128 S. Crenshaw Blvd., Los Angeles | 9 Units | Citibank |
| 1320 S. Burlington Ave., Los Angeles | 36 Units | Citibank |
| 2616 S. Alma Drive, Long Beach | Vacant/Board Up | F.D.I.C. |
| 7452 Alabama Street | Vacant/Board Up | California Federal |
| 8740 Topanga Canyon Boulevard | Vacant/Board Up | California Federal |
| 820 N. Wilshire Boulevard, Los Angeles | Vacant/Board Up | California Federal |



BIGGS & CO.   *Certified Public Accountants*
*Santa Monica, California 90405-2934*
*Tel: (310) 450-0875   Fax: (310) 450-9157*

Exhibit 1 - Page 82

**S**pecialized **SERVICES**

# Receivership *Services*

*Mr. Biggs has been appointed Receiver in over 1000 cases, both in state and federal court jurisdictions. The majority of these receiverships have been multiple family real properties, but numerous others have been commercial and retail buildings, office buildings, and shopping malls. Receivership cases have also included operating businesses and asset liquidations, the more prominent of which are highlighted following:*

### MIDA Industries, Inc.—Receivership

MIDA is a janitorial cleaning and service company with approximately $4 million a year in sales volume. Mr. Biggs was appointed Receiver to operate the business and liquidate its outstanding obligations owed to Independence Bank, which was in receivership under control of the FDIC. Mr. Biggs operated this business for approximately 2 1/2 years during which time MIDA was restored to profitability and generated cash to liquidate over $600,000 in obligations owed to the FDIC and other secured parties. MIDA is now operating profitably out of receivership.

### WCI

Mr. Biggs was appointed Receiver of this large temporary help and employee leasing company to liquidate a $1,000,000 obligation to the FDIC. Terms of the Receiver's Order required Mr. Biggs to liquidate receivables of the business and pay the proceeds directly to the FDIC. The Order did not provide for the Receiver to continue operating the business; however, Mr. Biggs was able to phase down operations of the business and administer the receivership in such a way that customers paid their receivables and did not withhold balances because of claims for offsetting damages or failure to perform. Consequently, all but approximately $50,000 of the FDIC obligation was liquidated, including accrued interest.

### Ocean Canyon Resorts

Mr. Biggs was appointed Receiver of this multiple location membership RV park operation. The receivership was not precipitated by financial and creditor problems, but rather was brought about because of disagreements among some of the partners of the partnerships.

Mr. Biggs directly managed the operations of the two parks from the date of his appointment as Receiver through their sale, a period of one year for one park and sixteen months for the other.

The partners requested that Mr. Biggs market and sell the two RV parks as going concern operations and liquidate the partnerships. Mr. Biggs was successful in selling the parks at or above their appraised values. The partnerships were terminated and cash proceeds were distributed to the partners. The partners realized a substantial gain on the sale of one park and a small loss on the sale of the second.

### Geneva Dental, Inc.

Geneva Dental, Inc. (GDI) held a distribution contract with a Swiss manufacturer of dentures for the marketing and distribution of the dentures throughout the U.S. and Canada. Mr. Biggs managed the operations of this company for the duration of a shareholder dispute. GDI had never operated profitably. Under Mr. Biggs' management, unnecessary operating costs

**Representative Cases**

*MIDA Industries, Inc. Receivership*

*WCI*

*Ocean Canyon Resorts*

*Geneva Dental, Inc.*

*Guaranty Bank v. Tri-State Reference Laboratories, Inc.*

*Commercial and Residential Properties*

(CONTINUED)



BIGGS & CO.  *Certified Public Accountants*
*Santa Monica, California 90405-2934*
*Tel: (310) 450-0875   Fax: (310) 450-9157*

Exhibit 1 - Page 83

# Receivership *Services* (CONTINUED)

were eliminated, management direction was focused on increasing sales, and the company commenced profitable operations for the first time in its history.

### Guaranty Bank v. Tri-State Reference Laboratories, Inc.

Tri-State Reference Laboratories, Inc. (Tri-State) was a medical laboratory which performed blood and urine tests for physicians and clinics. Mr. Biggs took control of the operations of Tri-State for the benefit of Guaranty Bank (Bank) to liquidate receivables and other assets held as collateral for the Bank's secured loan.

Shortly after his appointment, Tri-State filed a Chapter 11 bankruptcy proceeding. Mr. Biggs worked closely with attorneys for the Bank to prepare a cash collateral stipulation which provided current debt service payments, close monitoring of Tri-State's operations in bankruptcy and a provision for relief from the automatic stay in the event of default of the provisions of the stipulation.

Tri-State defaulted almost immediately upon approval of the cash collateral stipulation by the bankruptcy court and Mr. Biggs regained control of Tri-State's operations and assets. Through Mr. Biggs' actions the Bank's loan was repaid in full, including interest and costs. Mr. Biggs generated excess cash, which was turned over to the bankruptcy trustee.

Major benefits which Mr. Biggs provided this estate were his forensic accounting expertise, his ability to operate Tri-State's medical billing system, and collect outstanding receivables which had been written off by prior Tri-State management.

Mr. Biggs was able to reconstruct

and bill receivable accounts and collect these under "anti-kickback" provisions of federal law.

### Commercial and Residential Properties

From Costa Mesa to Santa Barbara to Santa Monica to San Bernardino, Mr. Biggs has been a Receiver and a Trustee for hundreds of properties, ranging from beautiful commercial centers to run-down apartment buildings in some of the most undesirable areas of Southern California.

On numerous occasions, Biggs & Co. revitalized uninhabital, low-occupancy buildings, managing the properties back to health. Mr. Biggs has overseen the handling of major aesthetic renovations and safety code violations, including painting, carpet and window repair, electrical and plumbing problems, inoperable elevators, broken down boilers, and other general maintenance and restorations. Biggs & Co. also upgraded units to rentable conditions and steadily increased occupancies, generating sufficient cash flow for owners to renegotiate their debts and bring the properties out of receivership.

Biggs & Co. also cooperated with federal immigration officials to remove illegal aliens harbored on the premises of several buildings under its management. Likewise, Biggs & Co. worked with local police to help curtail crime and evict questionable tenants, and met with disgruntled tenants to resolve complaints of poor living conditions, crime, and rental strikes.

## Representative Cases

*MIDA Industries, Inc. Receivership*

*WCI*

*Ocean Canyon Resorts*

*Geneva Dental, Inc.*

*Guaranty Bank v. Tri-State Reference Laboratories, Inc.*

*Commercial and Residential Properties*



BIGGS & CO. *Certified Public Accountants*
*Santa Monica, California 90405-2934*
*Tel: (310) 450-0875   Fax: (310) 450-9157*

Exhibit 1 - Page 84

**R e c e i v e r s h i p** *S e r v i c e s* (CONTINUED)

### Sherman v. Geneva Dental, Inc.

Samuel R. Biggs was appointed Receiver of Geneva Dental, Inc. by the Los Angeles Superior Court. In connection with his operation of this business, Mr. Biggs, through his firm Biggs & Co., performed work to reconstruct prior accounting transactions and bring all accounting records current. Subsequent to the return of a profitable company to its majority shareholders, Mr. Biggs was called to provide testimony in court relative to his accounting findings in a case filed by a minority shareholder against the company.

### Paual Estes

Samuel R. Biggs was appointed Receiver of Paula Estes, An Individual, by the Los Angeles Superior Court. This was a very complex case due to multiple property owners, tax issues relevant to property transfers from a decedent's estate to the current owners, trust tax filings and property title issues. A large portion of Mr. Biggs' work was related to the marketing and sale of a single family residence, and to negotiating and resolving entitlement disputes related to the proportionate distribution share of one of the property's owners.

*Selected Asset Liquidation Cases and Operating Businesses*

## Asset Liquidations

### Accounts Receivable

As Receiver Mr. Biggs liquidated approximately $1.4 million in receivables within three months for the FDIC, and paid down over 97% of the outstanding principal and accrued interest on outstanding loan balance.

### Inventory, Property & Equipment

Liquidated at auctions over $8 million in construction supplies, inventory tools and heavy equipment

Liquidated at auctions heavy duty injection molding equipment, dies, tools and related inventory

Liquidated at auctions retail furniture store inventory

Negotiated private sales of restaurant equipment, manufacturing equipment, autos

### Business Sales Negotiated

Manufacturer of air conditioning and environmental control equipment, recreational vehicle manufacturer, various retail businesses, and restaurants

## Businesses Operated

Manufacturer of specialty ladders for fire engines, Mortuary, Janitorial cleaning and maintenance company, Contract sewing company for garment industry, Office copier sales and services company ■

**Representative Cases**

*MIDA Industries, Inc. Receivership*

*WCI*

*Ocean Canyon Resorts*

*Geneva Dental, Inc.*

*Guaranty Bank v. Tri-State Reference Laboratories, Inc.*

*Commercial and Residential Properties*



BIGGS & CO. *Certified Public Accountants*
*Santa Monica, California 90405-2934*
*Tel: (310) 450-0875  Fax: (310) 450-9157*

Exhibit 1 - Page 85

**Specialized SERVICES**

# Receivership and Trustee *Services*
## *Successful Management and Operation of Businesses*

*As a former Bankruptcy Trustee for the Central District of California, Mr. Biggs administered over 12,000 bankruptcy cases ranging from individual consumer matters to real estate and commercial business cases with several million dollars of assets.*

*As Trustee and Receiver, Mr. Biggs managed and operated numerous companies through their successful reorganization, returning many to profitability.*

As a Bankruptcy Trustee and court appointed Receiver Mr. Biggs has over twenty years experience in matters of insolvency, operating troubled businesses and managing business turnarounds. He has operated numerous companies through their successful reorganization, including a manufacturing company, a janitorial and industrial cleaning company, two membership RV parks and a commercial real estate development. Mr. Biggs has also worked with several apparel companies in business turnaround situations or in liquidations.

In his capacity as Trustee, Mr. Biggs has valued and negotiated sales of numerous real estate assets, including single family residences, commercial properties, investment land and apartment buildings. He has also valued and negotiated the sale of numerous operating businesses and business assets. Most of these sales have been conducted through private negotiation but others have involved public auction.

**Standard Quality, Inc. dba Alaco Ladder**
*Samuel R. Biggs, Chapter 11 Trustee*
Alaco is a manufacturer of ladders with sales volume of approximately $2 million per year. As Chapter 11 Trustee, Mr. Biggs operated Alaco for approximately 4 years. He also managed its operations under its Plan of Reorganization until priority taxes and bankruptcy administrative expenses were paid. During the administration of this company, Mr. Biggs restored Alaco's operation to profitability and generated cash to liquidate over $500,000 in creditor and administrative claims.

**Olympic Collection**
Mr. Biggs was appointed Chapter 11 bankruptcy Trustee of this high profile commercial center in West Los Angeles. Mr. Biggs operated this facility for approximately $1^{1/2}$ years, during which time settlement agreements for debt restructure were negotiated with secured lenders. This business was successfully reorganized under a Plan of Reorganization and continues as a viable business operation.

**LanguageForce, Inc.**
Biggs & Co. was engaged to assist with the Chapter 11 bankruptcy filing and reorganization of LanguageForce. Biggs worked with the company's comptroller to prepare the emergency petition, schedules and statement of affairs, as well as to prepare the U.S. Trustee compliance package. Biggs provided the Debtor-in-Possession comprehensive consulting, accounting, tax and bankruptcy support services. Work was performed to assist in the pre-petition planning and development of insolvency financial strategies and plans, develop cost-cutting and management actions to achieve break-even or positive cash flow, prepare bankruptcy reports and accountings required by the U.S. Trustee, assist in defense of creditor actions, and prepare financial information for the disclosure statement and Plan of Reorganization.

**Representative Cases**

*Standard Quality dba Alaco Ladder*

*Olympic Collection*

*Language Force*



BIGGS & CO. *Certified Public Accountants*
*Santa Monica, California 90405-2934*
*Tel: (310) 450-0875  Fax: (310) 450-9157*

Exhibit 1 - Page 86

## SAMUEL R. BIGGS, RECEIVER AND TRUSTEE
### Successful Management of Business Entities

Samuel R. Biggs started the accounting firm of Biggs & Co. in 1983 after spending the previous 18 years working in both public accounting and private industry. Under Mr. Biggs' management and direction, Biggs & Co. has grown to be one of the top mid-size accounting and financial service firms in Southern California with recognized expertise in insolvency and commercial business operations.

Mr. Biggs has been appointed bankruptcy Trustee or Receiver in hundreds of asset cases. While most of these merely involved liquidation of assets or operations of multi-family, office or commercial facilities, several involved the actual operation and management of commercial businesses or the winding down thereof. In every one of these cases Mr. Biggs has brought the business through a successful bankruptcy Plan of Reorganization or Receivership. Some of the more significant cases are cited following:

- **Car Wash Facilities**

Mr. Biggs has operated two car wash facilities as Receiver, one located in Chino Hills, CA and one located in Moreno Valley, CA. Both of these businesses were taken over from uncooperative owners who provided no information on sales, expenses or operations of the businesses. In connection with his management and operation of these facilities, Mr. Biggs obtained required licenses and permits, insured that operations were in compliance with California regulatory and environmental laws, obtained sales, employment, business tax and licensing registrations and set up payroll and employment practices in compliance with Department of Labor requirements. During his administration of these businesses, Mr. Biggs increased operating efficiency and productivity of the facilities and is proceeding to list these business for sale through the Receivership under the jurisdiction of the Court.

- **Flying Tiger Self Storage**

Flying Tiger Self Storage is a public storage and retail business facility located in Lancaster, CA. This business consists of 675 storage units ranging in size from 5ft. x 5ft. to 20ft. x 15ft. both climate controlled and uncontrolled plus approximately 10,000 ft of retail space. Mr. Biggs has operated this facility in Receivership for over a year during which time he has increased revenues by 25%, managed the leasing of the retail space and generated over $250,000 in cash which has been used to pay current and delinquent property taxes on the facility.

Exhibit 1 - Page 87

- **Alaco Ladder Company**

When Mr. Biggs was appointed Chapter 11 bankruptcy Trustee for this long established manufacturer of fire engine and specialty ladders in late 1992, the company's cash position was totally depleted, no funds were available for payroll, insurance had lapsed and the company was essentially on the verge of closing its doors.

Immediately after taking control, Mr. Biggs was able to turn this company profitable. Alaco successfully emerged from bankruptcy in June, 1996 and Mr. Biggs was left in control to operate the business until creditors were paid.

Mr. Biggs has negotiated a sale of the company to a buyer who intends to continue operations of the business while consolidating it with his other business operations.

Under Mr. Biggs management, creditors will be paid 100% of their claims and the company, with its employees, has been saved.

- **Mida Industries, Inc.**

This commercial and industrial janitorial cleaning company ran into financial difficulty as a result of actions of a former dishonest co-owner of the company.  In late 1994, Mr. Biggs was appointed Receiver of Mida to operate the business and liquidate secured creditor obligations, principally the FDIC.

Mr. Biggs directed the operations of this company for almost three years, during which time he initiated financial reporting and controls and managed the company back to profitability.  During his administration, Mr. Biggs negotiated litigation claims resulting in reduction of debts by several hundred thousand dollars, including over $250,000.00 of payroll tax claims.  Over $750,000.00 of creditor claims were paid from cash generated from operations of the business.

At the termination of the Receivership, control of the company was turned back to the owner who had continued his employment with the company during the Receivership. This company is continuing as a viable, profitable business with its creditor problems behind it.

- **Olympic Collection**

Mr. Biggs was appointed Chapter 11 bankruptcy Trustee of this high profile commercial center in West Los Angeles.  Mr. Biggs operated this facility for approximately one and one-half years, during which time settlement agreements for debt restructure were negotiated with secured lenders.  This business was successfully reorganized under a Plan of Reorganization and continues as a viable business operation.

2

Exhibit 1 - Page 88

- **Individual Bankruptcy**

Mr. Biggs was appointed Chapter 11 bankruptcy Trustee of this individual debtor who held among his assets both general and limited partnership interests in numerous individual and business storage facilities. Mr. Biggs sold several of these facilities to generate cash and liquidate claims. He also negotiated settlements with certain creditors and reduced claims by several hundred thousand dollars. This individual debtor successfully emerged from bankruptcy under a confirmed Plan of Reorganization.

- **WCI**

Mr. Biggs was appointed Receiver of this large temporary help and employee leasing company to liquidate a $1,000,000 obligation to the FDIC. Terms of the Receiver's Order required Mr. Biggs to liquidate receivables of the business and pay the proceeds directly to the FDIC. The Order did not provide for the Receiver to continue operating the business, however, Mr. Biggs was able to phase down operations of the business and administer the Receivership in such a way that customers paid their receivables and did not withhold balances because of claims for offsetting damages or failure to perform. Consequently, all but approximately $50,000 of the FDIC obligation was liquidated, including accrued interest.

- **Mortuary & Funeral Services Business**

Mr. Biggs operated a mortuary and funeral services business for almost one year, as the bankruptcy trustee, during which time Mr. Biggs marketed and sold the business to a nationally recognized public company.Geneva Dental

Mr. Biggs was appointed Receiver to operate this dental products business during a period of dispute among the owners. During the roughly one year of his administration of the business, Mr. Biggs turned the business from operating at a loss to a profitable entity. Creditor liabilities were brought current and sufficient working capital was generated to allow the business to continue operations. During this period the disputes among the owners were sufficiently resolved to terminate the Receivership and allow the business to be returned to the control of the majority owner. Mr. Biggs and his firm were subsequently requested to provide services to assist in the sale of the business and it was sold to the company's principal product supplier.

3

Exhibit 1 - Page 89

- **Ocean Canyon Resorts**

Mr. Biggs was appointed Receiver of this multiple location membership RV park operation.  This Receivership was not precipitated by financial and creditor problems, but rather was brought about because of disagreements among some of the partners of the partnerships.

Mr. Biggs directly managed the operations of the two parks from the date of his appointment as Receiver through their sale, a period of 1 year for one park and sixteen months for the other.

Mr. Biggs was requested by the partners to market and sell the two RV parks as going concern operations and liquidate the partnerships.  Mr. Biggs was successful in selling the parks at or above their appraised values.  The partnerships were terminated and cash proceeds were distributed to the partners.  The partners realized a substantial gain on the sale of one park and a small loss on the sale of the second.


- **Chapter 11 Operating Cases and Liquidating Agent Appointments**

Mr. Biggs and his firm Biggs & Co. have been employed as accountants to Chapter 11 Debtors in Possession to assist in their successful reorganization in numerous cases and types of Business.  Additionally Mr. Biggs has continued as Liquidating Agent in numerous Plans of Liquidations whereby he was responsible for winding down the operations of the businesses, liquidating the assets and distributing proceeds to creditors under confirmed Plans of Liquidation.  A few of these cases are listed following.

- **Big A Drug Stores, Inc.:**    Accountants to Debtor and Liquidating Agent for this chain of 19 drug stores throughout California.

- **Santa Paula Memorial Hospital:**    Accountants to Creditors Committee and Liquidating Agent for this community hospital in Santa Paula, CA.

- **Unique Premium Metals, Inc.**:    Accountants to Debtor and Liquidating Agent for this precious metals (gold, platinum & silver) processor.

4

Exhibit 1 - Page 90

# RATE SCHEDULE

| | | | |
|---|---|---|---|
| Samuel R. Biggs, Partner | – Regular Work | $ | 375.00 |
| | – Depositions and Court Testimony | $ | 425.00 |
| Charles E. Kunz, Partner | – Regular Work | $ | 350.00 |
| | – Depositions and Court Testimony | $ | 400.00 |
| Dean Fredgant, Partner | – Regular Work | $ | 325.00 |
| | – Depositions and Court Testimony | $ | 375.00 |
| Samuel Okstad, Partner | | $ | 325.00 |
| Erin Rose, Manager | | $ | 175.00 |
| Lisa Nuzzi, Manager | | $ | 175.00 |
| Manager/Supervisor Accountants | | $ | 150-235.00 |
| Senior and Junior Accountants | | $ | 95-175.00 |
| Paraprofessionals | | $ | 50-125.00 |

Expenses

Expenses are billed at out-of-pocket cost.

Exhibit 1 - Page 91

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**120 Broadway, Suite 300, Santa Monica, CA 90401**

A true and correct copy of the foregoing document described as ***SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION FOR NEVADA STAR LLC*** will be served or was served in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On ***March 30, 2011***, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

⊠ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On ***March 30, 2011,*** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.
**BY OVERNIGHT MAIL**

| | | |
|---|---|---|
| Honorable Peter Carroll | United States Trustee (LA) | **Debtor** |
| United States Bankruptcy Court | Attention: Russell Clementson | Nevada Star, LLC |
| 255 E Temple Street, Courtroom 1539 | 725 S. Figueroa St. 26th Floor | c/o Claudia Raffone |
| Los Angeles, CA 90012 | Los Angeles, CA 90017 | 1401 Claridge Drive |
| | | Beverly Hills, CA 90210 |

☐ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ***Fill in Date Document is Filed,*** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.
**BY EMAIL**

| | |
|---|---|
| Catherine A. Grad - cgrad@grad-weinraub.com | Attorney for Tenants of 114 West 86thSt. |
| Andrew S. Hersch - ahirsch@BernsteinRE.com | Potential Buyer |

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| March 30, 2011 | Michael M. Mason | /s/ Michael M. Mason |
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                        **F 9013-3.1.PROOF.SERVICE**
819927.3

## Additional Service Information
## VIA NOTICE OF ELECTRONIC FILING (NEF)

Michael Jay Berger on behalf of Debtor Claudia Raffone (michael.berger@bankruptcypower.com);
Russell Clementson on behalf of U.S. Trustee United States Trustee (LA) (russell.clementson@usdoj.gov);
United States Trustee (LA) (ustpregion16.la.ecf@usdoj.gov.)
Lewis R Landau on behalf of Creditor Committee Creditors Committee of Nevada Star, LLC (lew@landaunet.com),
R G Pagter on behalf of Creditor Henry Campbell (gibson@pagterandmiller.com, pandm@pagterandmiller.com;
Thomas M. Geher (tmg@jmbm.com)
Brett A. Axelrod on behalf of Fox Rothschild LLP (baxelrod@foxrothschild.com, mrustia@foxrothschild.com)
David L. Neale on behalf of Creditor Beys , Stein & Mobargha LLP (dln@lnbrb.com, kjm@lnbrb.com)
Sandor T. Boxer on behalf of Creditor Castle Oil Corporation (tedb@tedboxer.com)
Michael W. Tan on behalf of Creditor United States of America, IRS (michael.w.tan@irscounsel.treas.gov)

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*

819927.3

**F 9013-3.1.PROOF.SERVICE**

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**120 Broadway, Suite 300, Santa Monica, CA 90401**

A true and correct copy of the foregoing document described as ***SECOND AMENDED CONSOLIDATED DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED CONSOLIDATED CHAPTER 11 PLAN OF LIQUIDATION FOR NEVADA STAR LLC*** will be served or was served in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On ***March 30, 2011***, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On ***March 30, 2011,*** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.
**BY OVERNIGHT MAIL**

| | | |
|---|---|---|
| Honorable Peter Carroll | United States Trustee (LA) | **Debtor** |
| United States Bankruptcy Court | Attention: Russell Clementson | Nevada Star, LLC |
| 255 E Temple Street, Courtroom 1539 | 725 S. Figueroa St. 26th Floor | c/o Claudia Raffone |
| Los Angeles, CA 90012 | Los Angeles, CA 90017 | 1401 Claridge Drive |
| | | Beverly Hills, CA 90210 |

☐ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ***Fill in Date Document is Filed,*** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.
**BY EMAIL**

| | |
|---|---|
| Catherine A. Grad - cgrad@grad-weinraub.com | Attorney for Tenants of 114 West 86thSt. |
| Andrew S. Hersch - ahirsch@BernsteinRE.com | Potential Buyer |

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| March 30, 2011 | Michael M. Mason | /s/ Michael M. Mason |
| *Date* | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                 **F 9013-3.1.PROOF.SERVICE**
819927.3

**Additional Service Information**
**VIA NOTICE OF ELECTRONIC FILING (NEF)**

Michael Jay Berger on behalf of Debtor Claudia Raffone (michael.berger@bankruptcypower.com);
Russell Clementson on behalf of U.S. Trustee United States Trustee (LA) (russell.clementson@usdoj.gov);
United States Trustee (LA) (ustpregion16.la.ecf@usdoj.gov.)
Lewis R Landau on behalf of Creditor Committee Creditors Committee of Nevada Star, LLC (lew@landaunet.com),
R G Pagter on behalf of Creditor Henry Campbell (gibson@pagterandmiller.com, pandm@pagterandmiller.com;
Thomas M. Geher (tmg@jmbm.com)
Brett A. Axelrod on behalf of Fox Rothschild LLP (baxelrod@foxrothschild.com, mrustia@foxrothschild.com)
David L. Neale on behalf of Creditor Beys , Stein & Mobargha LLP (dln@lnbrb.com, kjm@lnbrb.com)
Sandor T. Boxer on behalf of Creditor Castle Oil Corporation (tedb@tedboxer.com)
Michael W. Tan on behalf of Creditor United States of America, IRS (michael.w.tan@irscounsel.treas.gov)

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*
819927.3                                                                    **F 9013-3.1.PROOF.SERVICE**